**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-5043**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DECARLOS GEORGE,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. Terrence W. Boyle, District Judge. (7:12-cr-00035-BO-1)

Argued: September 20, 2013     Decided: October 16, 2013

Before NIEMEYER and AGEE, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Agee and Senior Judge Hamilton joined.

**ARGUED:** James Anthony Martin, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenville, North Carolina, for Appellant. Yvonne Victoria Watford-McKinney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas P. McNamara, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

NIEMEYER, Circuit Judge:

After Wilmington, North Carolina Police Officer Daniel Roehrig stopped a vehicle in a high-crime area of Wilmington at 3:30 a.m. for giving chase to another vehicle and running a red light, he observed suspicious conduct of Decarlos George, one of the passengers, and asked George to exit the vehicle. Upon frisking George, Officer Roehrig discovered a handgun and arrested him. During George's prosecution for possession of a handgun by a felon, in violation of 18 U.S.C. § 922(g)(1), George filed a motion to suppress evidence of the handgun, based on his claim that the frisk violated his Fourth Amendment rights. The district court denied George's motion, and George pleaded guilty to the charge.

Because the objective facts of record support the reasonableness of Officer Roehrig's suspicion that George was armed and dangerous and thus his authority to conduct a frisk, we affirm.

I

At 3:30 a.m. on Sunday, November 27, 2011, Officer Roehrig, while patrolling Wilmington District Two, which he characterized as "one of the highest crime areas in the city," observed a dark-colored station wagon closely and aggressively following another vehicle -- within a car's length -- as if in a chase.

2

As the two vehicles made a right turn, they ran a red light at the "fairly high rate of speed" of approximately 20 to 25 miles per hour such that their tires screeched. As Officer Roehrig pulled behind the vehicles following the turn, the station wagon, which had accelerated to approximately 45 miles per hour, slowed to 25 miles per hour and broke off the chase, making a left turn. Officer Roehrig followed the station wagon as it made three more successive left turns, which Officer Roehrig interpreted as an effort by the driver to determine whether he was following the vehicle. When Officer Roehrig decided to stop the vehicle for its aggressive driving and red light violation, he called for backup, which was answered by K9 Officer Poelling. With Officer Poelling nearby, Officer Roehrig then effected the stop in a parking lot.

As Officer Roehrig approached the vehicle, he observed four males in it, including Decarlos George, who was sitting behind the driver's seat. George was holding up his I.D. card with his left hand, while turning his head away from the officer. His right hand was on the seat next to his leg and was concealed from view by his thigh. Roehrig instructed George to place both of his hands on the headrest of the driver's seat in front of him, but George placed only his left hand on the headrest. This caused Officer Roehrig concern, as he "didn't know what [George] had in his right hand, [but it] could easily have been a

3

weapon." Officer Roehrig directed George again to place both hands on the headrest. As Officer Roehrig testified, "I had to give [George] several more requests to move his hand. Probably I asked four or five times. It was actually getting to the point that I was getting worried about what he had in his right hand." George ultimately complied, but he still never made eye contact with Officer Roehrig.

Once Officer Roehrig observed that George did not have a weapon in his right hand, he proceeded to speak with Weldon Moore, the driver of the vehicle. Moore denied running the red light and claimed he was not chasing anyone. When Officer Roehrig informed Moore that he had observed Moore chasing the other vehicle and going through a red light, Moore adjusted his story, now saying that his girlfriend was in the front vehicle and that he was following her home. Roehrig found this story inconsistent with Moore's aggressive chase of the other vehicle and the abandonment of that chase when the police were spotted. He found Moore's driving to be more consistent with hostile criminal activity, and he questioned the passengers in the car about recent gang violence.

Officer Roehrig then consulted with Officer Poelling, and the two decided to remove all four passengers from the car and interview them separately. Because the officers were outnumbered, they called for more backup. When backup officers

4

arrived, Officer Poelling removed the right rear passenger of the vehicle and conducted a protective frisk. Officer Roehrig then directed George to step out of the vehicle. As George was doing so, he dropped his wallet and cell phone onto the ground. As George bent over to pick the items up, Officer Roehrig stopped him by holding onto George's shirt, fearing that letting George bend over to the ground would create an increased risk of escape. Officer Roehrig turned George around, had him place his hands on the car, and conducted a protective frisk. During the pat down, Roehrig felt an object in George's right front pocket that he "immediately recognized as a handgun." After announcing the presence of the gun to the other officers, Roehrig pressed George against the car and placed him in handcuffs, as a second officer removed the handgun from George's pocket.

After the gun was seized, Officer Roehrig secured George in the back of his patrol car and issued Moore a written warning for failing to stop at a red light. Upon checking George's criminal history, Officer Roehrig discovered that George was a convicted felon and that the serial number on the gun indicated that it had been stolen. George was charged and pleaded guilty to possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

Before pleading guilty, George filed a motion to suppress the evidence of the gun on the ground that it resulted from an

5

unlawful frisk, in violation of his Fourth Amendment right to be free from unreasonable searches and seizures.

At the suppression hearing, George claimed that Moore was dropping him off at his home and that they had circled around the block because they had driven past George's house on the first pass. George also contended that he had made direct eye contact with Officer Roehrig during the stop and that he had put both hands on the headrest following Officer Roehrig's first request for him to do so. George also gave an explanation as to how he obtained the firearm, stating that he had found it on the sidewalk when walking home from work. According to George, he accidentally dropped his cell phone, activating the phone's light, which illuminated the gun as it was lying on the sidewalk. George claimed that he picked the gun up "to get it off the street."

The district court, in denying George's motion to suppress, found George's testimony inconsistent and implausible and instead credited Officer Roehrig's testimony on George's demeanor and actions. George then entered a conditional guilty plea, reserving the right to appeal the denial of his suppression motion. The district court sentenced George to time served, which amounted to a little over one year.

George filed this appeal, challenging only the district court's denial of his motion to suppress.

George acknowledges that Officer Roehrig had the right to stop the vehicle in which he was a passenger "[w]hen the driver ran the red light." He argues, however, that "[n]o objective facts supporting reasonable suspicion that Mr. George was armed or dangerous arose during the stop." Stated otherwise, he maintains that the facts of record, as found by the district court, failed to provide Officer Roehrig with a legal basis to frisk him and that the government and the court merely "cobbled together a set of factual circumstances that fell far short of supporting reasonable suspicion in this case."

The facts of record show that Officer Roehrig legally stopped Weldon Moore's vehicle for running a red light, see Whren v. United States, 517 U.S. 806, 810 (1996), and, after the stop, legally ordered the passengers from the vehicle, see Maryland v. Wilson, 519 U.S. 408, 415 (1997). The issue in this case centers on whether, after asking George to exit the vehicle, the facts as found by the district court show that Officer Roehrig had a sufficient basis to frisk him. This is a legal question that we review de novo. See United States v. Black, 525 F.3d 359, 364 (4th Cir. 2008).

To conduct a lawful frisk of a passenger during a traffic stop, "the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." Arizona

7

v. Johnson, 555 U.S. 323, 327 (2009). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. 1, 27 (1968). The reasonable suspicion standard is an objective one, and the officer's subjective state of mind is not considered. United States v. Powell, 666 F.3d 180, 186 (4th Cir. 2011).

In determining whether such reasonable suspicion exists, we examine the "totality of the circumstances" to determine if the officer had a "particularized and objective basis" for believing that the detained suspect might be armed and dangerous. United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981) (internal quotation marks omitted)); see also United States v. Hernandez-Mendez, 626 F.3d 203, 211 (4th Cir. 2010) ("[C]ourts have relied on a standard of objective reasonableness for assessing whether a frisk is justified"); United States v. Mayo, 361 F.3d 802, 808 (4th Cir. 2004) (evaluating a frisk by the totality of the circumstances).

A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000). A suspect's

suspicious movements can also be taken to suggest that the suspect may have a weapon. See, e.g., United States v. Raymond, 152 F.3d 309, 312 (4th Cir. 1998). And multiple factors may be taken together to create a reasonable suspicion even where each factor, taken alone, would be insufficient. See United States v. Branch, 537 F.3d 328, 339 (4th Cir. 2008). Thus, we will not find reasonable suspicion lacking "based merely on a 'piecemeal refutation of each individual' fact and inference." Id. at 337 (quoting United States v. Whitehead, 849 F.2d 849, 858 (4th Cir. 1988)).

In this case, we conclude from the totality of the circumstances that Officer Roehrig's frisk of George was supported by objective and particularized facts sufficient to give rise to a reasonable suspicion that George was armed and dangerous.

First, the stop occurred late at night (at 3:30 a.m.) in a high-crime area. Officer Roehrig testified that he had patrolled the area of the stop for his five-and-a-half year tenure with the Wilmington Police Department and that, based on his experience, it had one of the highest crime rates in the city and was characterized by violence and narcotics. While George argues that such conclusory testimony given by an officer should not be given much weight, as the government could have employed crime statistics to make the point, George himself

9

acknowledged in testimony that it was a "drug-related area." And although general evidence that a stop occurred in a high-crime area, standing alone, may not be sufficiently particularized to give rise to reasonable suspicion, it can be a contributing factor. See Wardlow, 528 U.S. at 124; United States v. Sprinkle, 106 F.3d 613, 617 (4th Cir. 1996). Likewise, that the stop occurred late at night may alert a reasonable officer to the possibility of danger. See United States v. Foster, 634 F.3d 243, 247 (4th Cir. 2011) (noting that the encounter occurred "in the middle of the day" in explaining why the officer lacked reasonable suspicion); United States v. Clarkson, 551 F.3d 1196, 1202 (10th Cir. 2009) ("[T]ime of night [is] a factor in determining the existence of reasonable suspicion").

Second, the circumstances of the stop suggested that the vehicle's occupants might well be dangerous. Officer Roehrig observed the vehicle aggressively chasing the vehicle in front of it, following by less than one car length. He also observed the two vehicles turn right through a red light at 20 to 25 miles per hour, which was a speed sufficient to cause the vehicles' tires to screech. But when Officer Roehrig began to follow the vehicles, the rear vehicle slowed down and ended its pursuit of the vehicle in front of it. Officer Roehrig concluded that the chase was consistent with the individuals in

10

the rear vehicle "engag[ing] in some type of crime against the people in the first vehicle," as it indicated hostility between the two vehicles. This suspicion, which we conclude was objectively reasonable in the circumstances, was reinforced when the second vehicle disengaged from its pursuit of the first vehicle upon seeing law enforcement.

Third, the vehicle that Officer Roehrig stopped was occupied by four males, increasing the risk of making a traffic stop at 3:30 a.m. in a high-crime area. "[The] danger from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car." Wilson, 519 U.S. at 414.

Fourth, George acted nervously when Officer Roehrig approached the vehicle. Without request, George held up his I.D. card while at the same time pointing his head away from Officer Roehrig. Moreover, even after Officer Roehrig gave George a direct order to put his hands on the headrest in front of him, George failed to comply and continued not to make eye contact with Officer Roehrig. Such conduct can contribute to reasonable suspicion. See Wardlow, 528 U.S. at 124; Branch, 537 F.3d at 338; Mayo, 361 F.3d at 808. To be sure, while the failure of a suspect to make eye contact, standing alone, is an ambiguous indicator, see United States v. Massenburg, 654 F.3d

11

480, 489 (4th Cir. 2011), the evidence may still contribute to a finding of reasonable suspicion.

Fifth, the driver of the vehicle made arguably misleading statements and presented Officer Roehrig with an implausible explanation for his aggressive driving. He initially claimed that he did not run the red light and that he was not chasing anyone. After Officer Roehrig confronted him with the fact that he had personally observed the chase and the red light violation, the driver stated that he had been following his girlfriend. But even that explanation was inconsistent with the driver's conduct in breaking off the chase. If the driver's girlfriend had been in the front car, it would not have been logical for the vehicles to suddenly part ways when a marked police car showed up. Such implausible and misleading statements contribute to the establishment of reasonable suspicion. See Powell, 666 F.3d at 188-89.

Sixth and most importantly, George's movements indicated that he may have been carrying a weapon. When Officer Roehrig initially approached the stopped vehicle, George's right hand was on the seat next to his right leg and was concealed by his thigh. When Officer Roehrig ordered George to put his hands on the headrest, George placed his left hand on the headrest, but not his right hand, which he kept next to his thigh. Officer Roehrig had to repeat his order four or five times: "It

12

was . . . getting to the point that I was getting worried about what he had in his right hand." As Roehrig explained, he "didn't know what [George] had in his right hand, [but it] could easily have been a weapon." Although Officer Roehrig's subjective impressions are not dispositive, we conclude that his concern in this instance was objectively reasonable.

Seventh and finally, after Officer Roehrig ordered George to step out of the vehicle, George dropped his wallet and his cell phone onto the ground as he got out of the car. When George bent over to pick the items up, Officer Roehrig stopped him. George's actions could have created an opportunity for him to reach for a weapon or to escape. Officers in such circumstances are not required to "take unnecessary risks in the performance of their duties." Terry, 392 U.S. at 23.

Taking these facts together in their totality, we are satisfied that Officer Roehrig had a "particularized and objective basis" for believing that George might be armed and dangerous. See Arvizu, 534 U.S. at 273. As such, he had a right to frisk George for weapons to protect himself and his fellow officers during the lawful stop. Adams v. Williams, 407 U.S. 143, 146 (1972).

George relies particularly on our decision in Powell to argue that the facts here were insufficient to justify the frisk. In Powell, the officers conducted a routine traffic stop

13

for a burned out headlight, 666 F.3d at 183, which was not in a high-crime area, id. at 187.  The stop began amicably, and the officer told Powell he was free to leave if he wanted.  Id.  During the stop, however, the officer was alerted to the fact that Powell had "priors" for armed robbery, and, with that information, the officer frisked Powell.  Id. at 184.  We held that those circumstances did not give rise to a reasonable suspicion that Powell was armed and dangerous.  Id. at 189.  The facts in Powell, however, are readily distinguishable from those presented here.  In this case, the stop occurred at 3:30 in the morning in a high-crime area; the driver of the vehicle could not explain his aggressive driving to the satisfaction of the officers; George was palpably nervous; George failed to obey the officer's orders, maintaining his hand on his right thigh as if to protect a weapon; and George exited the vehicle in a manner that created a threat to the officers.  We conclude that Powell provides George with scant support for his argument and that the officer's actions here were supported by a reasonable suspicion that George was armed and dangerous.

Accordingly, we affirm the district court's order denying George's motion to suppress and the judgment of the court.

AFFIRMED

14