**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4440

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JAVION SCOTT,

Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Malcolm J. Howard, Senior District Judge. (5:17-cr-00136-H-1)

Argued: September 18, 2019                    Decided: October 25, 2019

Before KING and KEENAN, Circuit Judges, and Joseph R. GOODWIN, United States District Judge for the Southern District of West Virginia, sitting by designation.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Keenan and Judge Goodwin joined.

**ARGUED:** Jaclyn Lee DiLauro, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Phillip Anthony Rubin, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** G. Alan DuBois, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Robert J. Higdon, Jr., United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

KING, Circuit Judge:

Defendant Javion Scott pleaded guilty in the Eastern District of North Carolina to possession of a firearm after having been convicted of a felony, in contravention of 18 U.S.C. § 922(g)(1). As part of a conditional guilty plea, Scott reserved his right to appeal the denial of his motion to suppress the firearm evidence underlying his conviction. On appeal, he maintains that the firearm evidence was seized during an unconstitutional warrantless search of his apartment.

At the time of the contested search, Scott was a North Carolina post-release supervisee. As part of his supervision, Scott was subject to a statutory search condition (the "statutory condition") that authorized warrantless searches of his residence by *a* probation officer. He was also subject to a search condition contained in his supervision agreement (the "agreement condition") that authorized warrantless searches of his residence by *his* assigned probation officer. Scott claims that the agreement condition — rather than the statutory condition — must control, and that his Fourth Amendment rights were violated because his assigned probation officer did not attend the search of his apartment. He also contends that, regardless of which condition controls, his Fourth Amendment rights were contravened because the search was conducted for purposes not reasonably related to his post-release supervision and without any individualized suspicion of criminal activity. As explained below, we reject Scott's contentions and affirm the district court's denial of his motion to suppress.

# I.

## A.

In June 2010, Scott was convicted in the Superior Court of Cumberland County, North Carolina, of violating North Carolina General Statute section 14-27.5(A), which resulted in an adjudication of guilt on a second-degree sexual offense. The state court sentenced Scott to a term of imprisonment ranging from 60 to 81 months. Upon his release, Scott was placed on state post-release supervision, which the North Carolina Post-Release Supervision and Parole Commission (the "Commission") administered.

North Carolina General Statute section 15A-1368.4 governed Scott's post-release supervision. That statute lists a bevy of requirements, some mandatory and others discretionary. For example, section 15A-1368.4(b) — entitled "Required Condition" — mandates that the Commission impose an express condition forbidding supervisees from committing additional crimes while on supervision. Section 15A-1368.4(c), on the other hand, lists several discretionary conditions that the Commission "may impose" on any supervisee.

Scott's adjudication of guilt subjected him to more required conditions than the average post-release supervisee. Section 15A-1368.4(b1) — entitled "Additional Required Conditions for Sex Offenders and Persons Convicted of Offenses Involving Physical, Mental, or Sexual Abuse of a Minor" — lists eight additional controlling conditions that apply to individuals, like Scott, who were convicted of certain sexual offenses. Scott's

3

appeal involves one of those additional controlling conditions — the statutory condition.

The statutory condition provides that a supervisee shall

> [s]ubmit at reasonable times to warrantless searches by *a* post-release supervision officer of the supervisee's person and of the supervisee's vehicle and premises while the supervisee is present, for purposes reasonably related to the post-release supervision, but the supervisee may not be required to submit to any other search that would otherwise be unlawful. For purposes of this subdivision, warrantless searches of the supervisee's computer or other electronic mechanism which may contain electronic data shall be considered reasonably related to the post-release supervision.

N.C. Gen. Stat. § 15A-1368.4(b1)(8) (emphasis added).

In drafting Scott's supervision agreement, however, the Commission failed to recite the statutory condition verbatim. Instead, the Commission came up with the agreement condition, which required that Scott "[s]ubmit at reasonable times to searches of my person, premises, or any vehicle under my control by *my* supervising officer for purposes reasonably related to my supervision." *See* J.A. 38 (emphasis added).[1]

B.

In November 2016, Courtney Thomas, a probation and parole officer with the North Carolina Department of Public Safety ("NCDPS"), took over supervision of Scott from another NCDPS officer.[2] When Thomas began supervising Scott, he was classified as a

---

[1] Citations herein to "J.A.__" refer to the contents of the Joint Appendix filed by the parties in this appeal.

[2] In reviewing the denial of a motion to suppress, we "defer to the district court's factual findings and do not set them aside unless [they are] clearly erroneous." *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005). We thus accept the facts related in the magistrate judge's Memorandum and Recommendation, which the district court

4

validated gang member due to his refusal to remove or cover gang-related tattoos. And Thomas knew that Scott had previously violated his curfew and had been disrespectful to NCDPS officers. Although Thomas had no such issues with Scott, his failure to obtain employment or enroll in continuing education classes bothered her. Thomas became concerned when she later observed Scott wearing "flashy" things — a necklace, mouth grill, watch, and "expensive looking" shoes — because she did not understand how Scott could afford those luxuries without a job. *See* J.A. 300.

At some point during Thomas's supervision of Scott, NCDPS asked Thomas to identify a few supervisees to be searched as part of Operation Spring Sweep, a multi-agency operation involving federal and state law enforcement agencies. The Sweep had two main purposes — to locate and arrest individuals with outstanding warrants or who had absconded from NCDPS, and to conduct warrantless searches of supervisees subject to search conditions. Thomas decided that Scott should be searched as part of the Sweep because of her suspicions regarding his extravagant jewelry and because NCDPS policy mandated a search of Scott within the succeeding forty-five days.[3]

On March 29, 2017 — the second day of Operation Spring Sweep — a search team arrived at Scott's apartment in Fayetteville at approximately 7:20 a.m. NCDPS officer

---

adopted by its Order denying Scott's motion. We recite the facts in the light most favorable to the government. *See United States v. Palmer*, 820 F.3d 640, 644 (4th Cir. 2016).

[3] NCDPS policy requires a search of supervisees with actively validated gang affiliations at least every 180 days. And supervisees convicted of certain sexual offenses must also be searched at least every 180 days. Scott fell into both categories.

5

Becky Staley led the search team. She was accompanied by three other NCDPS officers, ATF special agent Thomas Wishon, an additional ATF special agent, a deputy sheriff from the Cumberland County Sheriff's Office, a K-9 unit from the State Department of Corrections, an officer from the Fayetteville Police Department, and a trooper from the North Carolina Highway Patrol. Thomas did not attend the search, though she did attempt to delegate her authority to conduct warrantless searches of Scott to Staley.

Upon arriving at the apartment building, the four NCDPS officers led the search team up the stairs to Scott's apartment. One of the NCDPS officers knocked on Scott's door and announced the presence of the search team. The other three NCDPS officers stood directly outside the door on a landing at the top of the stairs. Wishon and his ATF colleague stood on the staircase descending from the landing; the remaining officers stood behind them. After the knock on the door, Staley heard noises coming from inside the apartment. She then heard the occupants say that they were getting dressed. But several minutes passed without anyone opening the door. The NCDPS officer who had knocked on Scott's door then knocked again. This time, an unclothed Scott opened the apartment door. Scott's girlfriend joined him at the door, wearing only her underwear. Staley advised Scott that the officers were there to conduct a warrantless search of his apartment. Scott permitted the officers to enter his apartment, though he would have been arrested had he denied them entry.

The NCDPS officers entered the apartment first, handcuffing Scott and his girlfriend after allowing Scott to use the restroom. ATF agent Wishon and the remaining law enforcement officers entered the apartment only after being told to do so by one of the

6

NCDPS officers. Thereafter, the NCDPS and other officers began searching the apartment. Soon after the search began, Wishon noticed that a door leading out onto the apartment's balcony was slightly ajar. As Wishon stepped onto the balcony and looked over the railing, he noticed two objects resembling firearms on the ground below. Upon further investigation, Wishon confirmed that the two objects he saw were indeed handguns. He also located — within the immediate vicinity of the two firearms — a high-capacity magazine, ammunition, and a purse that contained identification belonging to Scott's girlfriend.

Shortly thereafter, Wishon discovered that one of the handguns had been reported stolen. Because Wishon found the firearms near the identification card of Scott's girlfriend, he decided to question her. After waiving her *Miranda* rights, Scott's girlfriend admitted to Wishon that she had purchased the stolen handgun from unknown men in Fayetteville and that she had purchased the other handgun from a cousin. She told Wishon that she obtained the firearms because of ongoing threats against Scott's family and that she kept them on a chair in the bedroom she shared with Scott. She also admitted that Scott had previously pulled the slide back on the stolen handgun to "check it." *See* J.A. 305.

As Wishon conducted his investigation into the two firearms, the other members of the search team continued to search Scott's apartment. The officers located several items during the search, including marijuana. Pursuant to the statutory condition, officers also searched Scott's cell phone after he provided the phone's access code. The search of the phone revealed a photograph of Scott holding a handgun. But the handgun in the photograph did not match either of the firearms Wishon had located and seized from the

7

ground outside the apartment. While searching for the handgun in the photograph, officers discovered that a Black Kia Optima located outside the apartment was registered to Scott. A search of the Kia revealed more marijuana and a third firearm that appeared to be the same make and model as the handgun in the photograph on Scott's cell phone. Federal law enforcement officers subsequently arrested Scott.

## C.

On April 24, 2017, a grand jury in the Eastern District of North Carolina indicted Scott for possession of a firearm after having been convicted of a felony, in contravention of 18 U.S.C. § 922(g)(1). Scott moved to suppress the evidence seized during the warrantless search of his apartment (along with the evidence found in his automobile and on his cell phone), asserting that the search team did not comply with the requirements of the agreement condition because Thomas — his assigned probation officer — did not attend the search. Scott also contended that the warrantless search violated the requirements of the statutory condition because the search was not reasonably related to his supervision and because the search team lacked any individualized suspicion that he had engaged in criminal activity.

Approximately three months after Scott filed his motion to suppress, the magistrate judge conducted a suppression hearing in Greenville. At the hearing, the magistrate judge heard evidence from Thomas, Staley, Wishon, and Scott's mother. Thomas, Staley, and Wishon described the search of Scott's apartment, explaining how Thomas had selected Scott for the search and how Staley and Wishon had conducted their aspects of the search. In seeking to justify Scott's possession of the firearms, Scott's mother testified about his

8

tumultuous tenure in prison. And to undercut Thomas's testimony regarding her suspicions about Scott's jewelry, Scott's mother stated that the "flashy" jewelry likely belonged to Scott's deceased brother.

The magistrate judge questioned the lawyers about the discrepancy between the language of the statutory condition and that of the agreement condition. Scott's lawyer asserted that the Commission's decision to deviate from the specific terms of the statutory condition in writing the agreement condition amounted to a controlling interpretation of the ambiguous post-release supervision statute. The government disagreed, contending that the statutory condition controlled.

After considering the evidence and the arguments, the magistrate judge submitted her Memorandum and Recommendation to the district court, recommending that the motion to suppress be denied. *See United States v. Scott*, No. 5:17-cr-00136 (E.D.N.C. Dec. 20, 2017), ECF No. 43. The magistrate judge agreed with the government that the statutory condition — not the agreement condition — controlled. The magistrate judge then concluded that the search did not violate Scott's Fourth Amendment rights because it complied with the statutory condition, in that it was conducted by NCDPS officers for purposes reasonably related to Scott's post-release supervision. By its Order, the district court adopted the magistrate judge's Memorandum and Recommendation, overruling Scott's objections. *See United States v. Scott*, No. 5:17-cr-00136 (E.D.N.C. Feb. 13, 2018), ECF No. 53.

Scott thereafter pleaded guilty to the single-count indictment, expressly reserving his right to appeal the denial of his motion to suppress. The district court sentenced Scott

9

to seventy-eight months in prison. Scott timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

In assessing a district court's denial of a motion to suppress evidence, "we review the court's factual findings for clear error and its legal determinations de novo." *United States v. Abramski*, 706 F.3d 307, 313-14 (4th Cir. 2013).

III.

A.

Scott first challenges the warrantless search of his apartment on the ground that Thomas, his assigned probation officer, was not present during the search. In so doing, Scott points to the agreement condition, which states that Scott must submit to warrantless searches by *his* supervision officer — a deviation from the language of the statutory condition, which only requires that *a* supervision officer conduct the search.

Scott claims that by changing the wording of the statute in his supervision agreement, the Commission interpreted an ambiguous statute, and that its interpretation is entitled to deference under the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). But it is far from clear that the *Chevron* deference principles can ever apply to state agency interpretations of state law. *See id.* at 843-44 ("If *Congress* has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute

10

by regulation." (emphasis added)). Moreover, assuming *Chevron* applies in the state context, the Commission's interpretation of the statutory condition would not be entitled to any deference, in that it does not bear any of the hallmarks of formal rulemaking or adjudication necessary to trigger *Chevron* deference. *See United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).

Scott next contends that the agreement condition modified the statutory condition as it applied to him. Because, however, Scott's post-release supervision stemmed from a sexual offense conviction, the statutory condition was mandated under state law, and the Commission was powerless to modify the statutory condition. *See* N.C. Gen. Stat. § 15A-1368.4(b1) (listing the statutory condition under the heading "Additional Required Conditions for Sex Offenders and Persons Convicted of Offenses Involving Physical, Mental, or Sexual Abuse of a Minor" and noting that the conditions specified in that provision are "controlling conditions"). That the Commission had no authority to modify the required statutory condition is further bolstered by the General Assembly's decision to include in the post-release supervision statute a section entitled "Discretionary Conditions" — that the Commission "may impose." *See id.* § 15A-1368.4(c).

Finally, Scott urges that the district court should have at least read the language of the statutory condition in concert with the language of the agreement condition. But the court could not have read the clear language of the statutory condition in concert with the language in a supervision agreement drafted by the Commission. *See Crespo v. Holder*, 631 F.3d 130, 133 (4th Cir. 2011) ("It is well established that when the statute's language is plain, the sole function of the courts — at least where the disposition required by the text

11

is not absurd — is to enforce it according to its terms." (internal quotation marks omitted)). The statutory condition specifically provides that warrantless searches of supervisees may be undertaken by any post-release supervision officer. That ends our inquiry. Scott's reliance on the agreement condition is therefore rejected.

B.

Scott next challenges the warrantless search of his apartment on the ground that it did not comply with the statutory condition, as he contends that the search was not conducted for purposes reasonably related to his post-release supervision. Specifically, Scott recognizes that the statutory condition is generally constitutional under the Supreme Court's decision in *Griffin v. Wisconsin*, 483 U.S. 868 (1987), but he asserts that the search of his apartment contravened the Fourth Amendment because it did not adhere to the statutory condition.

The *Griffin* Court approved the warrantless search of a probationer's home conducted in accordance with a Wisconsin regulation authorizing such a search, reasoning that the search was justified under the "special needs" doctrine. *See* 483 U.S. at 873-74 ("A State's operation of a probation system, like its operation of a school, government office or prison, . . . presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements."). As the Court explained, the warrantless search in *Griffin* "was 'reasonable' within the meaning of the Fourth Amendment because it was conducted pursuant to a valid regulation governing probationers." *Id.* at 880. We subsequently relied on the *Griffin* decision to uphold a North Carolina probationer supervision statute that is nearly identical to the statutory condition

12

at issue in this appeal, as well as a search conducted in conformity with the probation statute. *See United States v. Midgette*, 478 F.3d 616, 622-24 (4th Cir. 2007).[4]

Scott's contention that the warrantless search of his apartment breached the statutory condition focuses on the statutory condition's requirement that a supervision search be conducted "for purposes reasonably related to the post-release supervision." *See* N.C. Gen. Stat. § 15A-1368.4(b1)(8). As an initial matter, we must discern the meaning of the term "reasonably related," as used in the statutory condition. In interpreting that term, "we must take [the statute] as it has been interpreted by . . . state courts." *See Griffin*, 483 U.S. at 875. "Whether or not we would choose to interpret a similarly worded federal [provision] in [a similar] fashion, we are bound by the state court's interpretation, which is relevant to [the] constitutional analysis only insofar as it fixes the meaning of the [statute]." *Id.*

The state courts in North Carolina have not provided us with a comprehensive definition of "reasonably related," as used in the statutory condition. Nevertheless, the Court of Appeals of North Carolina recently discussed the General Assembly's decision to amend the probationer supervision statute, which contains nearly identical language to the statutory condition. *See State v. Powell*, 800 S.E.2d 745 (N.C. Ct. App. 2017). The General Assembly, in amending the probation statute, replaced the term "reasonably related" with

---

[4] Although the Supreme Court's *Griffin* decision and our *Midgette* opinion involved probationers rather than post-release supervisees, such as Scott, the "special needs" doctrine does not turn on any such distinction. Rather, the doctrine requires a determination of whether the statute "assure[s] that the searches conducted pursuant to it are justified by the State's special needs." *See Midgette*, 478 F.3d at 624.

13

"directly related." *Id.* at 751. In evaluating the effect of that amendment, the court of appeals observed that "'[r]easonable' is defined, in pertinent part, as 'being or remaining within the bounds of reason.'" *Id.* (quoting Webster's Third New International Dictionary 1892 (1966)). Because the term "reasonably related" remains in the statutory condition, we accord the *Powell* definition some weight in evaluating Scott's contentions.

Bearing that definition in mind, we proceed to assess Scott's contention that the warrantless search of his apartment was not reasonably related to his supervision. Scott asserts, inter alia, that the search had nothing to do with his supervision because it occurred as part of Operation Spring Sweep, which he says the U.S. Marshals Service organized for generalized law enforcement purposes. As evidence of that theory, Scott points to the large number of law enforcement agencies involved. He also identifies press releases in which local law enforcement officials thank the Marshals Service for spearheading the operation. But pursuant to our precedent, the involvement of the Marshals Service and other law enforcement agencies does not render the warrantless search invalid.

In *Midgette*, Judge Niemeyer explained that "[w]hile North Carolina's probation law authorizes only probation officers to conduct warrantless searches, that authorization does not preclude the probation officer from obtaining help from the police department for the purpose of physically conducting the search." *See* 478 F.3d at 625-26. He further concluded — after examining two North Carolina state court decisions — that a probationer search would be valid even if a police officer had suggested the search, "so long as the search is authorized and directed by the probation officer." *See id.* at 626.

14

Here, NCDPS initiated and supervised the warrantless search of Scott's apartment. Although the Marshals Service organized Operation Spring Sweep, Thomas selected Scott for a search after her NCDPS supervisor asked her to choose a few supervisees to be searched as part of the Sweep. And a team of four NCDPS officers led the search team into Scott's apartment. Only after the NCDPS officers made initial contact with Scott did they request that the rest of the search team — comprised of police officers and federal agents — enter Scott's apartment to assist with the physical search of the premises. Additionally, NCDPS officer Staley, the team leader, actually supervised the search of Scott's apartment. Because Thomas decided that Scott's apartment should be searched and NCDPS officers initiated and supervised the search, *Midgette* compels the conclusion that the participation of law enforcement officers in the search did not render it invalid.

Scott also contends that the search was not reasonably related to his supervision because Thomas's proffered reasons for deciding to search Scott's apartment "do not hold up." *See* Br. of Appellant 20. But Thomas's two reasons for selecting Scott for a search are reasonably related to his post-release supervision. First, Thomas decided to search Scott because she had suspicions regarding how he had obtained his "flashy" jewelry without a job. Though Scott's mother later testified that the jewelry came from Scott's dead brother, the record does not indicate that Thomas had any such knowledge when she selected Scott for a search. And a search of Scott's apartment could certainly shed light on the source of the jewelry and Scott's employment status. The search based on the suspicions surrounding the jewelry thus supported the purposes of two conditions of Scott's

supervision — the requirement that he maintain employment and the requirement that he refrain from engaging in new criminal conduct.

Second, Thomas selected Scott for a search because he was about forty-five days away from the deadline for a mandatory search pursuant to NCDPS policy. That policy requires that NCDPS conduct searches of validated gang members and those on supervision for certain sexual offenses every 180 days. Scott asserts that he should not have been subject to the 180-day search policy because he repeatedly told Thomas that he no longer associated with a gang. But Scott remained a validated gang member subject to the 180-day policy because he declined to remove or cover his gang tattoos. And even if he had not been a validated gang member, he would have been subject to the 180-day policy because his supervision stemmed from an adjudication of guilt on a sexual offense. Additionally, although Scott suggests that the search occurred too soon before the 180-day mark to be reasonably related to his supervision, NCDPS officers have discretion to decide precisely when to conduct the mandatory search within each 180-day period. Because routine searches of gang members and sexual offenders are required for those high-risk supervisees, Thomas's decision to search Scott's apartment under the 180-day policy was reasonably related to his supervision.

At bottom, the record supports the district court's determination that the warrantless search of Scott's apartment was not for the purpose of furthering general law enforcement goals. Rather, NCDPS officers undertook the search to ensure Scott's continued compliance with the terms of his supervision agreement.

16

C.

Finally, we briefly address Scott's attack on the warrantless search of his apartment for lack of individualized suspicion of criminal activity. In the circumstances of this case — where the search complied with the statutory condition because it was reasonably related to Scott's post-release supervision — our *Midgette* decision makes clear that no such individualized suspicion is required. *See* 478 F.3d at 624 (observing that Midgette's argument that the North Carolina probation statute was unconstitutional because it did not require reasonable suspicion "misunderstands *Griffin*'s 'special needs' rationale, which did not make individualized suspicion the *sine qua non* of a valid probation scheme"). Because the search of Scott's apartment complied with the statutory condition, we conclude — in accordance with the *Griffin* decision — that no Fourth Amendment violation occurred.[5]

IV.

Pursuant to the foregoing, we affirm the district court's denial of Scott's motion to suppress.

*AFFIRMED*

---

[5] Having concluded that the search of Scott's apartment did not violate the Fourth Amendment under the framework established by the Supreme Court in *Griffin*, we decline Scott's invitation to evaluate the constitutionality of the search under the framework established by the Court in *United States v. Knights*, 534 U.S. 112 (2001) (applying traditional Fourth Amendment balancing test where warrantless search of probationer did not qualify as *Griffin*-type "special needs" search).