**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 20-4224**

─────────────

UNITED STATES OF AMERICA,

        Plaintiff − Appellee,

   v.

TERRY JAMES COX,

        Defendant – Appellant.

─────────────

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington.  Robert C. Chambers, District Judge.  (3:19-cr-00206-2)

─────────────

Submitted: March 30, 2021                         Decided:  July 8, 2021

─────────────

Before KEENAN, DIAZ, and THACKER, Circuit Judges.

─────────────

Affirmed by unpublished per curiam opinion.

─────────────

Neil R. Bouchillon, BOUCHILLON, CROSSAN & COLBURN, LC, Huntington, West Virginia, for Appellant.  Michael B. Stuart, United States Attorney, Charleston, West Virginia, R. Gregory McVey, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Huntington, West Virginia, for Appellee.

─────────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Terry Cox appeals the district court's order denying his motion to suppress a gun that police found in a vehicle he occupied. Cox argues that the gun was discovered during an illegal seizure in violation of his Fourth Amendment rights. For the following reasons, we affirm.

I.

A.

This case arose when members of the Huntington, West Virginia Violent Crime-Drug Task Force attempted to serve subpoenas on two individuals.

On their first attempt, the officers (who wore plain clothes and traveled in an unmarked van) observed live rounds on the front porch of the individual's home. On their second attempt, they noticed a woman on the porch and two men, later identified as Terry Cox and Tyrone Jones (Cox's co-defendant), inside a late-model white Mercury sedan parked in front of the home. One of the officers, Sergeant Paul Hunter, knew the woman and recognized the Mercury as the vehicle she was driving during a previous traffic stop.

The Mercury faced away from the officers, making it difficult for them to identify its occupants. But Hunter recalled that the woman's father had earlier reported his Mercury stolen. The officer speculated that the woman may have been at the residence "try[ing] to take out some street justice." J.A. 65.

2

The officers would have their backs to the Mercury as they attempted to serve the subpoenas at the house, so they decided to approach the car "to make sure [they] were safe first" and "let [the occupants] know that [they] were law enforcement." *Id.*

The officers displayed their badges to identify themselves. Hunter recalled keeping his gun holstered while approaching the Mercury. According to Hunter, when he displayed his badge, Jones "immediately looked at [him] and started reaching off to the left." J.A. 66.[1] In Jones's telling, he was on a video call with his niece and dropped his phone after being startled when officers surrounded the Mercury with guns drawn. Jones "went to pick the phone up," "thinking maybe [he] should . . . record the situation because . . . [of] what was going on." J.A. 125. The district court reasoned that the stories "[we]re not altogether in conflict," because "at some point while the officers were approaching the [Mercury], Jones bent forward and off to his side." *United States v. Cox*, No. 3:19-cr-00206, slip op. at 3 (S.D.W. Va. Nov. 21, 2019).

Jones's movements alarmed Hunter, who "thought [Jones] was reaching for a weapon." *Id.* The officers drew their service weapons and commanded Jones to show his hands. While initially nonresponsive, Jones "finally stopped reaching" after bending downward "two to three different times." J.A. 69. After removing Cox and Jones from the Mercury, one of the officers spotted a pistol in the rear seat.

---

[1] Another officer testified that Jones made repeated "motions down to the right side, possibly concealing or obtaining an object." J.A. 111.

3

B.

A grand jury in the Southern District of West Virginia indicted Cox and Jones for aiding and abetting the possession of firearms by felons, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Cox moved to suppress the gun, arguing that it was discovered during an illegal seizure in violation of his Fourth Amendment rights.

The district court denied the motion, reasoning that: (1) the officers' initial approach was merely a police-citizen encounter (which didn't implicate the Fourth Amendment); (2) the officers subsequently developed a reasonable suspicion that criminal activity was afoot; and (3) the gun's seizure was permissible under the plain-view doctrine.

Cox entered a conditional guilty plea to aiding and abetting possession of a firearm by a felon, reserving his right to appeal the denial of his motion to suppress. This appeal followed.

II.

When reviewing the denial of a motion to suppress, we review factual findings for clear error and legal determinations de novo. *United States v. Scott*, 941 F.3d 677, 683 (4th Cir. 2019). We view the evidence in the light most favorable to the party who prevailed in the district court, which is the government here. *United States v. Jamison*, 509 F.3d 623, 628 (4th Cir. 2007).

Cox argues that the district court erred in concluding that: (1) the officers seized him when he was removed from the Mercury; (2) Jones's movements and failure to raise

his hands supported a finding of reasonable suspicion; and (3) the officers discovered the gun in plain view. We consider each contention in turn.

A.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. But "[l]aw enforcement officers do not effectuate a detention or seizure 'merely by approaching individuals on the street or in other public places and putting questions to them.'" *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (quoting *United States v. Drayton*, 536 U.S. 194, 200 (2002)). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).

Put another way, an individual is "seized" when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554 (1980). In deciding whether a person is seized, we consider, *inter alia*, the number of officers present and whether the officers were in uniform, displayed their weapons, touched the defendant, attempted to block his departure or restrain movement, asked threatening questions, or treated the defendant as though they suspected him of "illegal activity rather than treating the encounter as routine in nature." *See Jones*, 678 F.3d at 299–300 (cleaned up). "[N]o one factor is dispositive" in our analysis. *United States v. Weaver*, 282 F.3d 302, 310 (4th Cir. 2002).

5

"A police officer may elevate a police-citizen encounter into an investigatory detention only if the officer has a 'reasonable suspicion supported by articulable facts that criminal activity may be afoot.'" *United States v. Burton*, 228 F.3d 524, 527 (4th Cir. 2000) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Reasonable suspicion is more than just an "inchoate and unparticularized suspicion or hunch," *Terry*, 392 U.S. at 27, but requires "considerably less than proof of wrongdoing by a preponderance of the evidence." *Sokolow*, 490 U.S. at 7.

Since the officers removed Cox from the Mercury and detained him, they undoubtedly seized him for Fourth Amendment purposes. The questions here are precisely *when* Cox was seized and *whether* the police had reasonable suspicion to seize him at that time.

Cox argues that he was seized either when the officers left their van or when they displayed their badges. The government responds that the officers' initial approach was a police-citizen encounter and not a seizure. The district court ruled that the approach was a police-citizen encounter that quickly became a seizure after Jones made sudden downward movements and failed to raise his hands when ordered to.[2]

Because police may engage in police-citizen encounters without triggering the Fourth Amendment's protections, we agree that the officers didn't seize Cox by simply approaching him. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991). And despite Cox's

---

[2] The court reasoned that there were two understandable justifications for approaching the Mercury: public safety and officer safety.

6

contention, the number of officers present isn't dispositive. Because the officers were not in uniform and exited an unmarked vehicle, Cox would have had no reason to believe he wasn't free to leave as the officers approached. Moreover, taking the evidence in the light most favorable to the government, we must assume (and, indeed, the district court found) that the officers approached the Mercury with their weapons holstered.

Admittedly, Hunter testified that he was not sure what he would have done had Jones tried to open the passenger door and leave. But we needn't concern ourselves with those hypothetical facts. There's no record evidence that the officers approached the car with the intent to prevent Cox or Jones from leaving. And Jones never attempted to leave the car—instead, he began making downward movements after seeing the officers. At that point, as we explain below, the officers reasonably suspected that Jones might be reaching for a weapon.

The fact that the officers displayed their badges likewise doesn't transform their approach into a seizure within the meaning of the Fourth Amendment. The officers were dressed in plain clothes and riding in an unmarked vehicle. And as Hunter testified, the officers wanted to identify themselves to the Mercury's occupants for safety purposes. The easiest way to do that was to display their badges.

We thus agree with the district court that the officers didn't seize Cox until they removed him from the Mercury, which occurred after Jones made sudden downward movements and failed to comply with the officers' commands that he raise his hands.

7

B.

We next consider Cox's argument that police didn't have reasonable suspicion to seize him. Reasonable suspicion that criminal activity "may be afoot" is viewed in light of the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). This is an objective standard, *United States v. Digiovanni*, 650 F.3d 498, 511 (4th Cir. 2011), which we determine by examining "the facts within the [officers'] knowledge." *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004). "The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

Cox contends that the officers lacked reasonable suspicion to seize him because (1) the encounter amounted to an unjustified protective search, (2) Jones had a right to remain put and not raise his hands, and (3) Jones's downward movements were not enough to support articulable suspicion. We disagree.

On this issue, the district court found "that at some point while the officers were approaching the vehicle, Jones bent forward and off to his side." *Cox*, slip op. at 3. At that point, the officers directed Jones to show them his hands, a command that Jones initially ignored, opting instead to continue reaching down inside the car. As the district court concluded, it was reasonable for the officers to infer that, when Jones saw the police approaching and immediately began reaching down inside the car, then ignored the officers' commands to show his hands and instead continued to reach down, Jones could

8

be reaching for a weapon or other dangerous object.[3] *See United States v. George*, 732 F.3d 296, 299–300 (4th Cir. 2013) (holding that "a suspect's suspicious movements can . . . be taken to suggest that the suspect may have a weapon. And multiple factors may be taken together to create reasonable suspicion even where each factor, taken alone, would be insufficient.") (citations omitted). In these circumstances, the officers had reasonable and articulable suspicion to detain Cox and Jones.

Cox argues that Jones had the right to stay put and remain on the phone with his niece. It's true that an individual has a "right to go about his business or to stay put and remain silent in the face of police questioning." *Wardlow*, 528 U.S. at 125. And an individual's "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for detention or seizure." *Bostick*, 501 U.S. at 437. But while Jones could have remained put, he didn't. Instead, he started making suspicious movements in the car when he saw the police approaching, which gave the police reasonable suspicion that criminal (and dangerous) activity was afoot. And because Cox and Jones occupied the same vehicle, the police lawfully seized them both.[4]

---

[3] "The officer need not be absolutely certain that the individual is armed"; what matters is whether "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.

[4] Regardless of whether the officers suspected Cox of wrongdoing, they were "not constitutionally required to give [Cox] an opportunity to depart the scene . . . without first ensuring that, in so doing, [they were] not permitting a dangerous person to get behind [them]." *Arizona v. Johnson*, 555 U.S. 323, 334 (2009). The officers didn't violate Cox's Fourth Amendment rights "by refusing to let him . . . leave the scene." *United States v. Meyers*, 760 F. App'x 181, 184 (4th Cir. 2019).

C.

Finally, we consider Cox's argument that the gun wasn't in plain view. "[T]he plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." *United States v. Green*, 599 F.3d 360, 376 (4th Cir. 2010).

Cox contends that the gun was only visible following an illegal seizure in violation of his Fourth Amendment rights.[5] But he concedes that the district court made no error if we find that the police had reasonable suspicion to seize him. Because we so find, we agree with the district court that the gun was discovered in plain view and was thus admissible.

\* \* \*

For the foregoing reasons, we affirm the district court's judgment.

*AFFIRMED*

---

[5] In the alternative, the government contends that the seizure and resulting search were valid because the Mercury was parked illegally, in violation of a Huntington ordinance. Because we affirm on the reasoning of the district court, we needn't address this argument.