*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 29, 2021

Plaintiff-Appellant,

v

No. 354414
Oakland Circuit Court
LC No. 2018-269141-FH

JAY DAVID SOULLIERE,

Defendant-Appellee.

Before: RIORDAN, P.J., and M. J. KELLY and SHAPIRO, JJ.

PER CURIAM.

The prosecution appeals as of right the trial court's order granting defendant's motion to suppress and dismiss charges. Defendant was charged with possession with intent to deliver methamphetamine, MCL 333.7401(2)(b)(*i*), and possession of alprazolam, MCL 333.7403(2)(b)(*ii*). Defendant filed a motion to suppress evidence obtained following an investigatory stop of defendant by police officers. After an evidentiary hearing, the trial court granted defendant's motion and dismissed the charges. The prosecution now appeals. We reverse and remand to the trial court further proceedings.

## I. FACTS

This case arises out of an investigatory stop of defendant on October 24, 2018. Oakland County Sheriff's Office Deputy Scott Panin, who was, at the time of the incident in question, a detective with the Oakland County Narcotics Enforcement Team ("NET"), was conducting surveillance for a particular suspect at 560 Farmdale in Ferndale, Michigan ("Farmdale house"). Deputy Panin was an expert in street-level drug trafficking, based on 16 years of law enforcement experience, four years with NET, extensive drug-related trainings, and hundreds of drug-crime investigations. At approximately 1:00 p.m. on October 24, 2018, Deputy Panin observed a red minivan pull into the driveway of the Farmdale house, followed by a grey sedan that pulled in behind it. Deputy Panin spotted two individuals in the grey sedan, and then observed what appeared to be the passenger handing money to the driver, who appeared to be counting that money. Deputy Panin classified this as a "[hand-to-hand] transaction." The entire encounter between the driver and the passenger lasted for only a couple of minutes—an encounter that

-1-

Deputy Panin classified as a "short-term [trafficking] transaction." Deputy Panin relayed his observations to Ferndale Police Department Detective Austin Bishop, and based on the information that Detective Bishop obtained from Deputy Panin, Detective Bishop contacted road patrol officers and requested that they stop the grey sedan, which was later identified as defendant's vehicle. The decision to stop defendant's vehicle was based on what Detective Bishop knew about the Farmdale house, as well as Deputy Panin's experience with drug trafficking, which indicated that what Deputy Panin had observed in the driveway of the Farmdale house was a hand-to-hand drug transaction. Notably, Detective Bishop knew defendant prior to the investigatory stop in question from former narcotics investigations involving defendant and methamphetamine.

## II. ANALYSIS

On appeal, the prosecution argues that the trial court erred when it granted defendant's motion to suppress evidence obtained following the investigatory stop of defendant by police officers. Specifically, the prosecution argues that the investigatory stop was supported by reasonable suspicion that defendant was engaging in drug-related criminal activity. We agree.

This Court reviews de novo a trial court's ruling on a suppression motion, *People v Steele*, 292 Mich App 308, 313; 806 NW2d 753 (2011), and its application of Fourth Amendment principles, *People v Jenkins*, 472 Mich 26, 31; 691 NW2d 759 (2005). However, this Court reviews for clear error the trial court's factual findings. *People v Hyde*, 285 Mich App 428, 436; 775 NW2d 833 (2009). "Clear error occurs if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *People v Johnson*, 502 Mich 541, 565; 918 NW2d 676 (2018) (quotation marks and citation omitted).

The Fourth Amendment of the United States Constitution and the related provision of the Michigan Constitution explicitly protect the right of the people to be free from unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11. It is well settled that unless a specifically established exception applies, searches and seizures conducted without a warrant are unreasonable per se. *Katz v United States*, 389 US 347, 357; 88 S Ct 507; 19 L Ed 2d 576 (1967). One exception to the general prohibition against warrantless searches and seizures is the so called "*Terry* stop." See *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). Under *Terry*, "if a police officer has a reasonable, articulable suspicion to believe a person has committed or is committing a crime given the totality of the circumstances, the officer may briefly stop that person for further investigation." *People v Barbarich*, 291 Mich App 468, 473; 807 NW2d 56 (2011). A reasonable suspicion is less than the level of suspicion needed for probable cause, but it requires something more than an inchoate or unparticularized suspicion, i.e., a "hunch." *People v Champion*, 452 Mich 92, 98; 549 NW2d 849 (1996).[1]

---

[1] The key difference between reasonable suspicion and a "hunch" is that the latter is defined merely by the subjective impressions of the officer. See, e.g., *United States v Thomas*, 211 F3d 1186, 1191 (CA 9, 2000) ("While courts analyze the facts leading to an investigatory stop in light of a trained officer's experience, these facts must be more than the mere subjective impressions of a particular officer. Reasonable suspicion must be based on more than an officer's inchoate and unparticularized suspicion or hunch.") (cleaned up).

An investigatory stop of a motor vehicle may be based upon "fewer facts than those necessary to support a finding of reasonableness where both a stop and a search are conducted by the police." *People v Yeoman*, 218 Mich App 406, 411; 554 NW2d 577 (1996). In determining whether reasonable suspicion existed, this Court should be guided by the principle that "common sense and everyday life experiences predominate over uncompromising standards." *People v Nelson*, 443 Mich 626, 635-636; 505 NW2d 266 (1993). Deference should be given to the common-sense assessment of police officers that criminal activity is afoot, in consideration of the "police officer's experience and the known patterns of certain types of lawbreakers." *People v Rizzo*, 243 Mich App 151, 156; 622 NW2d 319 (2000). However, "an officer testifying that he inferred on the basis of his experience and training is obliged to articulate how the behavior that he observed suggested, in light of his experience and training, an inference of criminal activity." *People v LoCicero (After Remand)*, 453 Mich 496, 505-506; 556 NW2d 498 (1996). If an investigative stop of a motor vehicle is proper, the police officer may detain the vehicle briefly to "make reasonable inquiries aimed at confirming or dispelling his suspicions." *Yeoman*, 218 Mich App at 411. Finally, in situations involving a police team, the knowledge of each officer on the team is imputed to the other officers on the team when conducting a Fourth Amendment analysis. See *United States v Cook*, 277 F3d 82, 86 (CA 1, 2002) ("Here, common sense suggests that, where law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop."); *United States v Gillette*, 245 F3d 1032, 1034 (CA 8, 2001) ("Where officers work together on an investigation, we have used the so-called 'collective knowledge' theory to impute the knowledge of one officer to other officers to uphold an otherwise invalid search or seizure.") (internal citation omitted).

Detective Bishop, an expert in street-level drug trafficking, based on two years of NET experience, extensive training, and hundreds of drug-crime investigations, ordered the investigatory stop of defendant's vehicle based on what he knew about the Farmdale house, including the fact that the previous Ferndale Police Department officer who was assigned to NET had open cases and investigations at the Farmdale house dating back to 2014 and 2015, and what he knew about defendant prior to the investigatory stop in question from former narcotics investigations involving defendant and methamphetamine.[2] In addition, Detective Bishop was aware from his own "previous encounters" with the original suspect that drugs may be sold from the Farmdale house. Further, Detective Bishop ordered the investigatory stop based on Deputy Panin's experience with drug trafficking, which confirmed that what he had observed in the driveway of the Farmdale house was a hand-to-hand transaction.

---

[2] Deputy Panin explained that he relayed the "license plate" of the grey sedan to Detective Bishop when informing Detective Bishop about the suspected drug transaction. This would have connected defendant to the vehicle. Regardless, Detective Bishop's knowledge of defendant is imputed to Deputy Panin, such that Detective Bishop's knowledge is properly considered in the Fourth Amendment analysis. See *Cook*, 277 F3d at 86. Despite the dissent's contention to the contrary, this is an accurate reading of the record as to Detective Bishop's role in the investigatory stop.

Deputy Panin, also an expert in street-level drug trafficking, based on 16 years of law enforcement experience, four years with NET, extensive drug-related trainings, and hundreds of drug-crime investigations, described a hand-to-hand transaction between defendant and the passenger that he believed to be consistent with drug trafficking. Notably, Deputy Panin explained how his previous training and experience led him to the conclusion that the activity he witnessed looked like a drug transaction. Indeed, Deputy Panin's previous training and experience led to his judgment that defendant was engaging in criminal activity. Deputy Panin observed a red minivan pull into the driveway of the Farmdale house, followed by a grey sedan that pulled in behind it. Deputy Panin later discovered that the person in the red minivan owned the Farmdale house. And through his training and experience, Deputy Panin knew that hand-to-hand transactions were likely transpiring when the owner of the house was also there. Further, Deputy Panin believed the encounter between defendant and the passenger to be consistent with drug trafficking because he saw the passenger handing money to defendant, defendant counting that money, followed by defendant pulling out of the driveway and driving off—an encounter that did not last for more than a couple of minutes, which was, based on Deputy Panin's training and experience, a short-term trafficking transaction.

Although Deputy Panin did not actually see the passenger take something in return, the surrounding circumstances—an exchange of money for something within a short timeframe in the driveway of a house known as a place where people sold drugs, movement of defendant's car immediately after the exchange, and the immediate departure of the passenger (i.e., the buyer)— coupled with Detective Bishop's knowledge and experience, support a fair probability that defendant was selling contraband from his vehicle.[3] Therefore, there was reasonable suspicion to investigate further. In other words, giving deference to Deputy Panin's and Detective Bishop's knowledge and experience, defendant's conduct gave rise to more than an unparticularized suspicion that criminal activity was afoot. An apparent exchange in the driveway of a house known for drug sales was sufficient for Deputy Panin, in his 16-year experience as a police officer and detective with the Oakland County Sheriff's Office, to relay his observations to Detective Bishop, who ultimately ordered the investigatory stop based on Deputy Panin's experience with drug trafficking and what Detective Bishop knew about the Farmdale house. Accordingly, the trial court erred by granting defendant's motion to suppress evidence and dismiss charges, and it is reversed.

## III. CONCLUSION

---

[3] Defendant argues that none of these facts, considered individually, were sufficient to support reasonable suspicion. This argument misses the mark. It is elementary that "multiple factors may be taken together to create a reasonable suspicion even where each factor, taken alone, would be insufficient." *United States v George*, 732 F3d 296, 300 (CA 4, 2013). In other words, we consider the "*totality* of the circumstances," not each individual fact, in assessing whether reasonable suspicion existed. See *id*. at 299-300. Courts "will not find reasonable suspicion lacking based merely on a piecemeal refutation of each individual fact and inference." *Id*. at 300 (quotation marks and citations omitted).

Reversed and remanded to the trial court for further proceedings.  We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Michael J. Kelly