**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 20-4087**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

JASON WATTIE BUZZARD,

Defendant – Appellant.

**No. 20-4221**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

PAUL WILLIAM MARTIN,

Defendant – Appellant.

**No. 20-4228**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

PAUL MARTIN,

                    Defendant – Appellant.

———————————

Appeals from the United States District Court for the Southern District of West Virginia, at Charleston. Joseph R. Goodwin, District Judge. (2:19-cr-00022-1; 2:19-cr-00021-1; 2:16-cr-00143-1)

———————————

Argued: January 28, 2021                          Decided: June 11, 2021

———————————

Before MOTZ, DIAZ, and RICHARDSON, Circuit Judges.

———————————

Affirmed by published opinion. Judge Diaz wrote the opinion, in which Judge Motz and Judge Richardson joined.

———————————

**ARGUED:** David Robert Bungard, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellants. Louie Alexander Hamner, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee. **ON BRIEF:** Gerald Morton Titus, III, SPILMAN, THOMAS & BATTLE, PLLC, for Appellant Jason Wattie Buzzard. Wesley P. Page, Federal Public Defender, Jonathan D. Byrne, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant Paul William Martin. Michael B. Stuart, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

———————————

DIAZ, Circuit Judge:

In this consolidated appeal, Jason Wattie Buzzard and Paul William Martin challenge the district court's denial of their motions to suppress evidence found when police searched a car they occupied. Martin also challenges the denial of his motion for acquittal at trial and the revocation of his term of supervised release at sentencing. For the following reasons, we affirm.

I.

A.

Shortly after 1:30am on October 12, 2018, West Virginia police officer Tyler Dawson pulled over a car for a defective brake light.[1] Buzzard was driving and Martin was in the passenger seat of the car, which had recently left the parking lot of a Sheetz gas station and convenience store. Dawson, who was patrolling alone that night, called into dispatch that he was stopping a vehicle with two occupants and gave his location. He then approached the vehicle and recognized Martin (he'd had prior interactions with Martin while on duty).

At some point during the stop, Dawson asked whether there was anything illegal in the car (the parties dispute when this occurred). In response, Buzzard and Martin both volunteered drug paraphernalia; Buzzard produced a marijuana "bowl" from under his shirt and Martin produced a hypodermic needle and syringe.

_____

[1] The parties agree that Dawson lawfully initiated the traffic stop.

3

Additional officers arrived on the scene and Buzzard and Martin were removed from the vehicle. The officers searched the car and recovered two handguns wrapped in socks— one from under the driver's seat and one from under the passenger's seat. They arrested Buzzard and Martin, who were each charged with being a felon in possession of firearms.[2]

## B.

Martin and Buzzard filed nearly identical motions to suppress the guns, together with additional evidence found in the vehicle. They claimed that Officer Dawson violated their Fourth Amendment rights by asking whether there was anything illegal in the car because the question wasn't related to the traffic stop's mission and unlawfully prolonged the stop. After a joint evidentiary hearing, the district court denied both motions.

## C.

Buzzard pleaded guilty to being a felon in possession of firearms. His plea agreement preserved his right to appeal the denial of his motion to suppress.

Martin went to trial on a second superseding indictment that charged him with being, and conspiring to be, a felon in possession of firearms. At the close of the government's case, Martin moved for a judgment of acquittal on both counts. The district court granted the motion with respect to the conspiracy charge but denied it with respect to the possession charge. The jury found Martin guilty of being a felon in possession of

---

[2] Martin's probation officer subsequently filed a petition to revoke a term of supervised release that Martin was serving for a prior offense.

firearms. During sentencing, the district court granted the petition to revoke Martin's previous term of supervised release.

This appeal followed.

## II.

Buzzard and Martin maintain that the district court should have suppressed the guns because Officer Dawson violated their Fourth Amendment rights when he asked whether there was anything illegal in the car. When reviewing the denial of a motion to suppress, we review factual findings for clear error and legal determinations de novo. *United States v. Scott*, 941 F.3d 677, 683 (4th Cir. 2019). When, as here, the government prevailed below, we view the evidence in the light most favorable to the government. *United States v. Jamison*, 509 F.3d 623, 628 (4th Cir. 2007).

## A.

The evidence before the district court included Dawson's, Buzzard's, and Martin's testimony at the suppression hearing. Dawson testified as follows. The traffic stop occurred in a high-crime area, where officers, including Dawson himself, had previously made multiple arrests for narcotics. There's a known drug house within a block of the location, and people often use the free Wi-Fi at the Sheetz to arrange drug deals.

Dawson made the call to dispatch as soon as he pulled the car over. On his overnight shift, it's common practice that when a lone officer calls in that he's stopping a vehicle with more than one occupant, another officer will join him as soon as possible. That night, the first additional officer arrived within three to five minutes.

5

After making the call, Dawson walked to the driver's side window and spoke with Buzzard. At this point in a traffic stop, Dawson "[a]lways advise[s] [the occupants] why [he] stopped them and then [] always ask[s] for license[,] [] registration, [and] proof of insurance." J.A. 150. In response to this request, Buzzard began looking for the registration and insurance and explained that it wasn't his car. Dawson then recognized Martin in the passenger's seat. He knew that Martin had a history of drug addiction, that he'd recently gotten out of prison, and that he was a convicted felon.

As Dawson spoke with Buzzard, Martin kept moving and looking around. Martin "would not sit still in the seat and [] wasn't making eye contact with" Dawson. J.A. 153. Martin also interrupted Dawson repeatedly as he spoke with Buzzard, saying things like "hey, you know, we're not up to anything. It's just me." *Id.* Martin's behavior was abnormal for a passenger during a traffic stop, and Dawson suspected that he might run.

Because it was late at night and there were two individuals in the car—one of whom he thought might run—Dawson decided to wait for another officer to arrive before returning to his vehicle to check what information he could (Buzzard hadn't been able to provide a driver's license, registration, or insurance). While waiting for an additional officer to arrive, Dawson asked Buzzard if there was anything illegal in the vehicle. He asked this question because of "the time of night and the high drug area, Mr. Martin's history and Mr. Martin's behavior." J.A. 158. In response, Buzzard volunteered the marijuana bowl. Dawson had Buzzard step out of the vehicle and performed a pat search for weapons. During this time, "Martin was bent over. He seemed to be fiddling around near the floorboard of the car." J.A. 160.

6

As Dawson finished his pat search of Buzzard, Officer Tony Messer arrived. Dawson passed Buzzard off to Messer and moved to Martin's side of the car. That's when Martin produced a hypodermic needle and syringe to Dawson. After Dawson asked Martin to step out of the vehicle and began to perform a pat search on him, Messer told Dawson to cuff Martin because there were guns in the car (after Dawson passed Buzzard off to Messer, Buzzard told Messer that Martin had guns in the car). The police ultimately searched the car and found the two handguns wrapped in socks under the driver's and passenger's seats.

Martin told a different story. He testified that Dawson never introduced himself, mentioned the reason for the stop, or asked Buzzard for his license and registration. Rather, Martin testified, Dawson simply walked up to Buzzard's window and asked, "Is there anything illegal in the car?" J.A. 181–82. Martin further testified that he later heard Dawson tell Buzzard that he pulled them over because he'd seen Martin get in the car at Sheetz.[3]

Buzzard, who was sequestered during Martin's testimony, similarly testified that Dawson simply walked up to his window and asked whether he had anything illegal in the car. He denied that Dawson introduced himself, told Buzzard the reason he'd stopped the car, or asked for Buzzard's license and registration. Buzzard also testified that he'd later heard Dawson tell Messer that Dawson had "seen Mr. Martin in the car and knew he was up to something." J.A. 187. On cross, the government asked whether Buzzard had talked

---

[3] On cross, the government elicited that Martin had four prior felony convictions.

7

with Martin about the case while in prison and, when Buzzard answered no, impeached him with a recorded jail call in which Buzzard and Martin spoke about the case with a woman Buzzard was dating at the time.[4]

B.

Buzzard and Martin argue that Dawson's question violated their Fourth Amendment rights because (1) it wasn't related to the traffic stop's mission, and (2) it unlawfully prolonged the stop. We take each argument in turn.

1.

Buzzard and Martin contend that, by asking whether there was anything illegal in the vehicle, Dawson "transformed a legitimate traffic stop into an investigation to see if Buzzard and Martin were engaged in any criminal conduct." Appellant's Br. at 14. Because the question was "directed toward general law enforcement goals, not the basis for the traffic stop or concerns for officer safety," they argue, "[t]he investigation unduly extended the traffic stop without Dawson having reasonable suspicion to do so." *Id.* at 14–15. The district court rejected this argument, reasoning that the question was related to the stop's mission because it relates to both officer and highway safety.

Buzzard and Martin rely primarily on *Rodriguez v. United States*, 575 U.S. 348 (2015). There, a K-9 officer pulled over a vehicle that had slowly veered onto the shoulder of the highway before jerking back onto the road. *Rodriguez*, 575 U.S. at 351. The officer questioned the driver and the passenger, ran records checks on both men, called for backup,

---

[4] The government also elicited that Buzzard had three prior felony convictions.

8

wrote a warning ticket, and returned the men's documents. *Id.* at 351–52. He then asked for permission to walk his dog around the vehicle. *Id.* at 352. The driver refused, but the officer did so anyway, and the dog alerted to the presence of drugs. *Id.* "All told, seven or eight minutes had elapsed from the time [the officer] issued the written warning until the dog indicated the presence of drugs." *Id.* The police subsequently searched the vehicle and found a large bag of methamphetamine. *Id.*

The Supreme Court held that the dog sniff was outside the scope of the traffic stop's mission. *Id.* at 356. The Court explained that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* at 354 (cleaned up). Because a dog sniff "is a measure aimed at detecting evidence of ordinary criminal wrongdoing" and "[l]ack[s] the same close connection to roadway safety as [] ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission." *Id.* at 355–56 (cleaned up).

Here, the district court determined that Dawson's question related to officer safety, reasoning that it "could expose dangerous weapons or narcotics" and that courts "have already recognized the authority of officers conducting a traffic stop to inquire about dangerous weapons." *United States v. Martin*, 395 F. Supp. 3d 756, 760 (S.D.W. Va. 2019) (citing *United States v. Everett*, 601 F.3d 484, 495 (6th Cir. 2010); *Arizona v. Johnson*, 555 U.S. 323, 327 (2009)) (cleaned up). The court also reasoned that "asking generally if illegal items are in the vehicle relates to highway safety at least as much as searching for traffic warrants to ensure that 'vehicles on the road are operated safely and responsibly' or to

'make[] it possible to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses.'" *Id.* (quoting *Rodriguez*, 575 U.S. at 355). Thus, the court held, Dawson's question was permissible because it related to the traffic stop's mission.

Viewing the evidence in the light most favorable to the government, we agree with the district court that Dawson's question related to officer safety and thus related to the traffic stop's mission. Dawson was outnumbered, and he asked the question because of "the time of night and the high drug area, Mr. Martin's history and Mr. Martin's behavior." J.A. 158. Given the totality of the circumstances, it makes sense that he needed to know more about what Buzzard and Martin had in the car.

It's true that the question "Is there anything illegal in the vehicle?" could be interpreted more broadly than one worded slightly differently (for example, "Is there anything dangerous in the vehicle?" or "Are there weapons in the vehicle?"). But given the importance of officer safety and the Supreme Court's repeated recognition that "[t]raffic stops are 'especially fraught with danger to police officers,'" *Rodriguez*, 575 U.S. at 356 (quoting *Johnson*, 555 U.S. at 330), we decline to require such laser-like precision from an officer asking a single question in these circumstances.

## 2.

In any event, Dawson's question didn't extend the stop by even a second. In arguing that the question unlawfully prolonged the stop, Buzzard and Martin again rely on *Rodriguez*. Prior to deciding *Rodriguez*, the Supreme Court held that a dog sniff conducted *during* a lawful traffic stop doesn't violate the Fourth Amendment. *See Illinois v. Caballes*, 543 U.S. 405, 408 (2005). In *Rodriguez*, the Court considered "whether the Fourth

Amendment tolerates a dog sniff conducted *after completion* of a traffic stop." 575 U.S. at 350 (emphasis added). The Court said no, holding that:

> [A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation.

*Id.* at 350–51 (cleaned up).

Viewing the evidence in the light most favorable to the government, Dawson was mid-stop when he asked whether there was anything illegal in the vehicle. He didn't yet have the information he needed to perform the customary checks on the driver and vehicle, and he was waiting for an additional officer to arrive so he could safely proceed with the stop. Because the question was asked during a lawful traffic stop and didn't prolong the stop, it passes constitutional muster under *Rodriguez* even if it exceeded the scope of the stop's mission. *See United States v. Bowman*, 884 F.3d 200, 210 (4th Cir. 2018) ("[P]olice *during the course of a traffic stop* may question a vehicle's occupants on topics unrelated to the traffic infraction . . . as long as the police do not extend an otherwise-completed traffic stop in order to conduct these unrelated investigations.") (cleaned up).[5]

Accordingly, we affirm the district court's denial of the motions to suppress.

### III.

---

[5] The government contends that Dawson also had reasonable suspicion that Buzzard and Martin were engaging (or about to engage) in criminal activity. Because we find that Dawson's question was related to the stop's mission and didn't extend it, we need not decide this issue.

11

Martin also challenges the district court's denial of his motion for acquittal of the felon in possession charge. Specifically, he argues that there was insufficient evidence for the jury to conclude that he possessed the guns recovered from the car.

A.

We review the denial of a motion for acquittal de novo. *United States v. Kiza*, 855 F.3d 596, 601 (4th Cir. 2017). "We must uphold the jury's verdict if, viewing the evidence in the light most favorable to the government, substantial evidence supports it." *Id.* "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Cornell*, 780 F.3d 616, 630 (4th Cir. 2015).

B.

Relevant here, the jury heard the following evidence. Before Martin met Buzzard at Sheetz that night, the two used Facebook Messenger to arrange for Buzzard to sell the guns to Martin. They negotiated the price, location, and timeframe for the sale, and the messages culminated with Buzzard arriving to pick up Martin from Sheetz. Indeed, surveillance footage from Sheetz shows Martin getting into the car with Buzzard. And importantly, Buzzard testified that he physically handed the guns to Martin when Martin got into the car.

Officer Dawson testified that, while he was searching Buzzard, he could see Martin "out of the corner of [his] eye . . . still rummaging through his pockets, and . . . going down towards the floorboard of where he was seated in the passenger seat." J.A. 314. And after

12

Martin was removed from the car, he told Dawson that Buzzard had guns in the car that Buzzard was trying to get rid of.

The police eventually found a gun under the driver's seat towards the backseat and another gun under the passenger's seat, both within reach of where Martin was sitting. Officer Adam Criss, who arrived on the scene after Officer Messer and helped search the car, testified that he found a white sock under the passenger's seat that "felt kind of heavy," and when he handled the sock it "felt like the handle of a pistol inside the sock." J.A. 442–43.

This evidence was more than sufficient for the jury to conclude that Martin possessed the guns. Martin knew that Buzzard had the guns in the car and intended to buy them. And not only did Buzzard testify that he handed the guns to Martin when Martin got into the car, there's also plenty of circumstantial evidence that Martin was the one who hid the guns under the driver's and passenger's seats.[6]

We thus affirm the district court in denying Martin's motion for acquittal. And because Martin's challenge to the revocation of his prior term of supervised release is based entirely on his assertion that there wasn't substantial evidence for his conviction, we likewise affirm that decision.

---

[6] Martin contends that even if the jury believed that Buzzard handed him the socks, there's no evidence that Martin knew there were guns inside them. But Officer Criss could tell there was a gun inside one of the socks immediately upon handling it and, in any event, the evidence indicating that Martin was the one who hid the guns suggests that he knew what they were.

\*     \*     \*

Accordingly, the district court's judgments are

*AFFIRMED.*