**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-4233**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

NATHANIEL MARTIN,

Defendant - Appellant.

---

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  Irene C. Berger, District Judge.  (2:24-cr-00025-1)

---

Argued:  December 12, 2025                                    Decided:  April 17, 2026

---

Before KING, THACKER, and BENJAMIN, Circuit Judges.

---

Reversed and vacated by published opinion.  Judge Benjamin wrote the majority opinion, in which Judge Thacker joined.  Judge King wrote a dissenting opinion.

---

**ARGUED:** Lex A. Coleman, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant.  Donald Keith Randolph, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.  **ON BRIEF:** Wesley P. Page, Federal Public Defender, Jonathan D. Byrne, Appellate Counsel, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant. Lisa G. Johnston, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

DEANDREA GIST BENJAMIN, Circuit Judge:

Nathaniel Martin was stopped in a vehicle by an officer in the Monongahela National Forest. The officer discovered firearms in the vehicle. Two-and-a-half years later after that stop, Martin was charged with felon in possession of a firearm pursuant to 18 U.S.C. §§ 922(g)(1) and 924(a)(8). He moved to suppress the firearm at issue and his inculpatory statements from that stop, contending the stop violated his Fourth Amendment rights. The district court denied his motion. He now appeals arguing that the stop was unlawful because the officer immediately abandoned the purpose of the stop and engaged in a criminal investigation unrelated to the basis of the stop. We agree with Martin and reverse the district court's denial of his motion to suppress and vacate his guilty plea.

I.

A.

On September 6, 2021, Nathaniel Martin was a passenger in Melisa Jarvis' vehicle in the Monongahela National Forest. Officer Joshua Radford, a United States Forest Service law enforcement officer, was on patrol in the forest. Radford encountered Martin and Jarvis twice while on patrol. First, Radford noticed Jarvis' vehicle pulled off the road, and he stopped to ask whether Jarvis and Martin were lost or needed help. About 45 minutes later, Radford encountered Jarvis' vehicle again, this time parked on a single-lane bridge in the forest a few miles away from where Radford first noticed them. Radford pulled up behind Jarvis' car, after which Jarvis proceeded along the bridge and parked on

2

the side of the road. Radford passed Jarvis' vehicle and parked ahead of them, and both Martin and Jarvis voluntarily exited the vehicle. Radford then exited his vehicle.

Radford initiated the traffic stop because Jarvis' vehicle was illegally parked on a bridge.[1] Radford turned on his body camera, but it did not begin to record audio until thirty seconds after he began speaking to Jarvis and did not record video until two minutes into the stop. During those two unrecorded minutes, Radford informed Jarvis that the traffic stop was for obstructing a single-lane bridge and asked for Jarvis' driver's license and whether there were any firearms in the vehicle. Jarvis admitted to a firearm being in the vehicle. As the bodycam footage begins, Radford asks Jarvis whether there is anything else in the vehicle—a question he testified was "kind of a catch-all, particularly for any officer safety elements" as Jarvis reached back into the vehicle to look for her license. J.A. 58–59.[2] At this point, Martin is lingering on the opposite side of the vehicle away from Radford.

A minute later, Radford asked Martin for his license as Jarvis got back into the vehicle. About 45 seconds after that, Radford asked Jarvis where the firearm was located. Jarvis gestured that the firearm was beneath the driver's seat. Approximately one minute later, Radford retrieved the firearm, stating he wanted to check the serial number. After

---

[1] Under West Virginia law, "[n]o person shall stop, stand or park a vehicle, except when necessary to avoid conflict with other traffic or in compliance with law or the directions of a police officer or traffic-control device, in any of the following places. . . [o]n any bridge or other elevated structure on a highway or within a highway tunnel." W. Va. Code Ann. § 17C-13-3(a)(14).

[2] Citations to "J.A." refer to the joint appendix filed by the parties. The J.A. contains the record on appeal from the district court. Page numbers refer to the "J.A. #" pagination.

briefly taking a look at the firearm, Radford asked again whether there was anything else in the car, and Jarvis admitted that there was a second firearm in the vehicle beneath the passenger seat.

Radford returned to his truck to run license and criminal history checks. However, he had to radio police dispatch to run the checks as his service in the area was poor. He did not request a check of the serial number of the firearm from dispatch. While waiting on the license and criminal history checks to return, Radford instructed Martin and Jarvis to stay outside of the vehicle and began discussing ginseng with the two of them. He expressed concern about ginseng poaching in the area and noted that "both of the places [Radford] contacted [Jarvis and Martin] is right where people have been poaching ginseng." J.A. 31; Bodycam Footage, at 10:04–10:11.[3]

Approximately twelve-and-a-half minutes into the traffic stop, police dispatch reported that Martin had prior felony convictions. After requesting backup, Radford placed Martin under arrest and secured the second firearm from under the passenger seat. He released Jarvis without a citation and returned her weapon to her. Radford then took Martin to a family gathering close by, spoke to Martin's mother about the firearm, released Martin, and informed him criminal charges were possible.

### B.

Approximately two-and-a-half years later, Martin was charged as a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Martin moved

---

[3] Volume II of the joint appendix contains a DVD. It is cited as Bodycam Footage, at 10:04–10:11.

4

to suppress all evidence seized following the traffic stop and all inculpatory statements made by Martin during the stop. The district court held a hearing on the motion to suppress in which Radford was the only witness to testify.

Ultimately, the district court denied the motion, finding that Radford did not extend the traffic stop for any purposes unrelated to the stop and thus Martin's Fourth Amendment rights were not violated. Martin accepted a plea agreement expressly preserving his right to appeal the denial of the motion to suppress.

The court now considers Martin's appeal. We have jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## II.

"When reviewing the denial of a motion to suppress, we review factual findings for clear error and legal determinations de novo." *United States v. Buzzard*, 1 F.4th 198, 201 (4th Cir. 2021) (citing *United States v. Scott*, 941 F.3d 677, 683 (4th Cir. 2019)). "When, as here, the government prevailed below, we view the evidence in the light most favorable to the government." *Id.* (citing *United States v. Jamison*, 509 F.3d 623, 628 (4th Cir. 2007)).

## III.

The Fourth Amendment protects the rights of citizens "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Stopping a vehicle and "detaining its occupants constitute[s] a seizure within

5

the meaning of [the Fourth] Amendment[].'' *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979) (cleaned up).  But traffic stops are more akin to an investigative detention rather than a custodial arrest.  *See Rodriguez v. United States,* 575 U.S. 348, 354 (2015); *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992).  Thus, the two-step inquiry articulated in *Terry v. Ohio*, 392 U.S. 1 (1968), is applicable here.  *See Rusher*, 966 F.2d at 875.

*Terry* instructs us to make two distinct determinations: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  *Terry*, 392 U.S. at 20. Martin does not dispute whether the stop was reasonable to start, leaving us to make only the second determination—whether Radford's actions were reasonably related in scope to the initial purpose of the traffic stop.

The permissible scope of a traffic stop is generally "determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns."  *Rodriguez*, 575 U.S. at 354 (cleaned up).  But a traffic stop should " 'last no longer than is necessary to effectuate the purpose of the stop.' "  *United States v. Sharpe*, 470 U.S. 675, 684 (1985) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).  And officers must "diligently pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly."  *Id*. at 686.

Of course, an "officer's mission can include 'ordinary inquiries incident to the traffic stop' " such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Rodriguez*, 575 U.S. at 355 (cleaned up).  And in certain

6

circumstances, officers may ask general questions related to officer safety. *See Buzzard*, 1 F.4th at 203–04. Those inquiries are lawful so long as they do not prolong the stop. *Id.* ("Because the question was asked during a lawful traffic stop and didn't prolong the stop, it passes constitutional muster under *Rodriguez* even if it exceeded the scope of the stop's mission.").

In *Buzzard*, the court held that the question "Is there anything illegal in the vehicle?" did not impermissibly expand the scope of the stop because it was sufficiently related to officer safety concerns, asked during a lawful traffic stop, and did not prolong the stop. 1 F.4th at 202. The stop there was initiated at night and in a high drug-crime area. *Id.* at 204. Before engaging the occupants, the officer called for backup, a usual practice when stopping a vehicle with more than one occupant. *Id.* at 201. The officer had prior interactions with the passenger in the vehicle and knew him to be a convicted felon with a history of drug addiction who had recently been released from prison. *Id.* at 200–01. The passenger "kept moving and looking around," repeatedly interrupted the officer while he attempted to engage the stop, and was bent over "fiddling around near the floorboard of the car." *Id.* at 202.

It was not until after all this abnormal activity, mid-stop, that the officer asked whether there was anything illegal in the vehicle because he feared the passenger might run. *Id.* Importantly, the officer asked the question before he was able to gather "the information he needed to perform the customary checks on the driver and the vehicle." *Id.* at 204. The court reasoned that "given the totality of the circumstances, it ma[de] sense that [the officer] needed to know more about what [the occupants] had in the car." *Id.* at

7

203–04. The court specifically noted the number of occupants, the time of night, the high drug-crime area, the passenger's criminal history, and the passenger's erratic behavior when concluding that the officer "didn't extend the stop by even a second." *Id*. at 204.

Here, Radford exceeded the scope of the seizure by immediately engaging in a criminal investigation unrelated to the traffic violation warranting the stop—obstruction of traffic by parking on a single-lane bridge. Initiating the stop, Radford first informed Martin and Jarvis that he was stopping them for parking on the single-lane bridge, and then he immediately asked about the presence of firearms. During the unrecorded two minutes of the stop, he asked Jarvis for her license. The bodycam footage audio begins with Radford asking if there was anything else in the vehicle. About a minute later, Jarvis gave Radford her license and Radford immediately requested Martin's license and the registration for the vehicle. Approximately 45 seconds later, after receiving Martin's license, Radford asked about the location of the first firearm. One minute after that, Radford asked again whether there was anything else in the vehicle which resulted in Jarvis confessing to the second firearm. Radford's questions were not reasonably related in scope to the purpose of the stop and were instead focused on investigating unrelated criminal activity.

Those inquiries would have been lawful if they were conducted during the course of a diligently conducted stop, but that is not the case here because Radford abandoned the stop from the very beginning. To begin, when initiating the stop, Jarvis had already moved the car from the single-lane bridge. Radford's purpose in conducting the traffic stop had seemingly been resolved. It makes little sense for Radford to then move on to proceed with the stop, let alone to prolong the stop to question about the presence of firearms.

8

And unlike the officer in *Buzzard*, Radford was not mid-stop when he began questioning about the presence of firearms. He led the stop with that question. He only briefly mentioned the traffic violation for which he stopped Jarvis and Martin and then raced to question them both about the presence of firearms and anything else "he should know about" in the vehicle. Contrary to how the dissent views the facts, Radford was able to perform the customary checks on the occupants and vehicle at the stop's inception but instead chose to engage in the unfounded criminal investigation about firearms. *Cf. Buzzard*, 1 F.4th at 204 (the officer was unable "to perform the customary checks on the driver and vehicle, and he was waiting for an additional officer to arrive so he could safely proceed with the stop"). He was not "waiting for additional officer[s]" and even after obtaining Jarvis' and Martin's licenses and registration, he continued to ask about the presence of firearms and whether anything illegal was in the vehicle. Accordingly, Radford did not diligently pursue the purpose of the stop and impermissibly extended the stop from its inception.

It is also telling that Radford never returned to the purpose of the stop. While waiting for the license checks to be returned, Radford mentioned his concerns about ginseng poaching in the area, noting that "both of the places [Radford] contacted [Jarvis and Martin] is right where people have been poaching ginseng." J.A. 31; Bodycam Footage, at 10:04–10:11. "Permits are required for digging and collecting ginseng" in the forest and some areas "are off-limits to ginseng harvest." Monongahela National Forest - Ginseng Permits, UNITED STATES FOREST SERVICE (August 22, 2025), [https://perma.cc/4VCR-ZHSS]. "[G]inseng is always a concern" in the Monongahela

9

National Forest and something officers remain on the lookout for there.  J.A. 65; *see also* J.A. 81.  And after completing this second investigation unrelated to the traffic stop, Radford did not issue a citation to either Jarvis or Martin for parking on the bridge.

Our colleague in dissent posits that this case is just like *Buzzard*, but ignores that, in totality, "these circumstances" do not raise the same safety concerns as the circumstances in *Buzzard* did.  *See* 1 F.4th 198, 204 (4th Cir. 2021).  We acknowledge that "traffic stops are especially fraught with danger to police officers" and "the risk of harm to both the police and the occupants of a stopped vehicle is . . . minimized . . . if the officers routinely exercise unquestioned command of the situation."  *Arizona v. Johnson*, 555 U.S. 323, 330 (2009).  However, unlike general interests in criminal enforcement, an "officer['s] safety interest stems from the mission of the stop itself."  *Rodriguez*, 575 U.S. at 356.  The court in *Buzzard* determined the *Buzzard* officer's question "related to officer safety and thus related to the traffic stop's mission. . . [g]iven the totality of the circumstances."  *Buzzard*, 1 F.4th at 203-04.  Here, Radford's questions were not related to officer safety.

We do not dispute the danger that traffic stops may present, as the dissent notes. But the heart of our analysis rests on whether Radford's questioning was warranted based on the totality of the circumstances.  Such questioning by law enforcement is *not* "always constitutionally permissible due to the importance of officer safety."  Diss. Op. at 22. (internal quotations omitted).  Nor does our precedent in *Buzzard* say that.  The court in *Buzzard*—only after being persuaded by the "time of night and high drug area, [the passenger's] history and [the passenger's] behavior"—held that it made sense that the officer "needed to know more about what Buzzard and Martin had in the car."  *Buzzard*, 1

10

F.4th at 204.  Here, no facts necessitate any holding that Radford "needed to know more about what" Martin and Jarvis had in the car.

Unlike the stop in *Buzzard*, the stop here occurred in the middle of the day.  Unlike the passenger in *Buzzard*, neither Martin nor Jarvis exhibited any traits suggesting that danger might be afoot.  Radford said as much: he stated he did not feel he was in danger after learning of at least one firearm in the vehicle.  *See* J.A. 60.  For the entire stop, Radford did not secure Martin or Jarvis.  With knowledge of an unsecured firearm, Radford first allowed Jarvis to reach in the vehicle for her purse.  About a minute later, he let her enter the vehicle to obtain the vehicle's registration, even still, without knowing where the firearm was.  He even turned his back to Martin and Jarvis while Jarvis reentered the vehicle to obtain the vehicle registration.  Bodycam Footage, at 0:58-1:03.  Radford had no problem with Martin standing outside of the vehicle several feet away while Radford spoke to Jarvis.  In fact, when he learned of the presence of a firearm at the stop's inception, he did not immediately ask Jarvis to secure it.  Instead, Radford let almost five minutes pass before he retrieved the firearm.  And after he secured the firearm to check the serial number "to see if the firearm was stolen," he placed it back in the vehicle.  J.A. 61.  Even more probative of the lack of danger, Radford drove Martin to a family gathering close by and released him into his mother's custody.

No matter what the Government may claim about Radford's safety concerns, "[t]he reasonableness of a seizure depends on what the police in fact do." *Rodriguez*, 575 U.S. at 357.  And as discussed above, Radford abandoned the mission of the stop to engage in a

11

criminal investigation unrelated to that mission, and the circumstances of the stop did not exhibit safety concerns warranting his questions.

IV.

For the above reasons, we reverse the denial of Martin's motion to suppress and vacate his guilty plea.

*REVERSED AND VACATED*

KING, Circuit Judge, dissenting:

My dear colleagues in the panel majority have concluded that the well-seasoned district judge erred as a matter of law in denying defendant Nathaniel Martin's motion to suppress evidence obtained during a September 2021 traffic stop in the Monongahela National Forest, which was conducted by a Forest Service officer named Radford. As the majority explains, that traffic stop — which occurred in a very remote and isolated part of the National Forest in Nicholas County, West Virginia, along the banks of the Cherry River — involved an unaccompanied Radford asking the driver of the vehicle, a woman named Jarvis, and her passenger, defendant Martin, whether there were any firearms inside of the vehicle. By that line of questioning — which occurred promptly after the automobile had been pulled over by Radford for illegally obstructing a single-lane bridge spanning the Cherry River — it was revealed that Martin was illegally possessing a firearm.

As the Supreme Court has routinely emphasized, "[t]raffic stops are especially fraught with dangers to police officers." *See Rodriguez v. United States*, 575 U.S. 348, 356 (2015); *Arizona v. Johnson*, 555 U.S. 323, 327 (2009). For that precise reason, the federal courts that have addressed this issue — including our Court in 2021 — have recognized that law enforcement "question[ing] related to officer safety . . . [is] related to [a] traffic stop's mission," so long as the line of inquiry is objectively reasonable, "[g]iven the totality of the circumstances." *See United States v. Buzzard*, 1 F.4th 198, 203-04 (4th Cir. 2021); *see also, e.g.*, *United States v. Ross*, 151 F.4th 487, 497 (3d Cir. 2025) (recognizing that "[q]uestions directly tied to officer safety, such as asking the driver whether there are any passengers in the car or if he has any weapons on him, are always permitted on officer-

13

safety grounds"); *United States v. Taylor*, 60 F.4th 1233, 1237 (9th Cir. 2023) (concluding that questions about there being "any weapons in the vehicle . . . are negligibly burdensome precautions that an officer may take in order to complete his mission safely" (citation modified)); *United States v. Yang*, 39 F.4th 893, 902-03 (7th Cir. 2022) (recognizing that officer questioning about whether there were any weapons in stopped truck was "proper because it concerned officer safety"); *United States v. Weaver*, 9 F.4th 129, 143 n.57 (2d Cir. 2021) (observing that questioning aimed at gauging risks or deescalating situation may qualify as "reasonable precautionary measures during traffic stops to ensure the safety of [officers] and others"); *United States v. Everett*, 601 F.3d 484, 495 (6th Cir. 2010) (explaining that "it would be irrational to conclude that officers cannot take the less intrusive measure of simply asking whether a driver has a gun" (citation modified)); *United States v. May*, 203 F.3d 53, at *3 (D.C. Cir. 1999) (unpublished) (concluding that "[t]he Fourth Amendment . . . permits an officer to ask simply whether a driver has a gun").[1]

Departing from the text of the Fourth Amendment and our precedent, my friends in the panel majority have concluded that Officer Radford's firearms-related questioning was

---

[1] I readily acknowledge that *Buzzard* — which stands for the proposition that law enforcement "question[ing] related to officer safety . . . [is] related to [a] traffic stop's mission," so long as the line of inquiry is objectively reasonable, "[g]iven the totality of the circumstances," *see* 1 F.4th at 203-04 — binds today's panel. *See, e.g., McMellon v. United States*, 387 F.3d 329, 334 (4th Cir. 2003) (en banc). And as discussed herein, even under *Buzzard*'s totality-of-the-circumstances standard, I am of opinion that Officer Radford's firearms-related questioning during the traffic stop was more than reasonable. But if our Court's *Buzzard* precedent is ever revisited, I would also be satisfied to adopt a "per se" rule — like the Third Circuit in *Ross* and the Ninth Circuit in *Taylor* — that such questioning during a valid traffic stop is always permitted on officer-safety grounds.

constitutionally impermissible, thus rendering erroneous the district court's denial of Martin's motion to suppress. In my view, however, Radford's questioning was more than objectively reasonable — given the totality of the circumstances that confronted him in a desolate and lonely part of the National Forest — such that there was no Fourth Amendment violation. Because I would affirm the district court, I respectfully dissent.

I.

A.

For the most part, I take no issue with the panel majority's recitation of the relevant facts.[2] As the majority recounts, in September 2021, defendant Martin was a passenger in a vehicle being driven by Jarvis in the Monongahela National Forest.[3] After the solo Radford had encountered Martin and Jarvis once in the National Forest, some 45 minutes later at approximately 4:00 PM, he encountered the pair again. This time, Martin and Jarvis were "parked on a single-lane bridge in the forest a few miles away from where Radford

---

[2] As the majority acknowledges, we are obliged to view the evidence in the light most favorable to the government, given that the district court denied Martin's motion to suppress evidence obtained during the traffic stop. *See, e.g.*, *United States v. Seidman*, 156 F.3d 542, 547 (4th Cir. 1998); *United States v. Jamison*, 509 F.3d 623, 628 (4th Cir. 2007).

[3] The Monongahela National Forest is located in the Allegheny Mountains of eastern West Virginia. It protects approximately 921,000 acres of federally managed land within a 1,700,000 acres proclamation boundary, which includes much of the Potomac Highlands Region of West Virginia, along with portions of 10 counties in the State. Headwaters of six major river systems are located within the forest: the Monongahela, the Potomac, the Greenbrier, the Elk, the Tygart, and, of especial relevance here, the Gauley.

first noticed them." *See ante* 2.  As the majority explains, because Jarvis's "vehicle was illegally parked on [the] bridge," Radford then "initiated [a] traffic stop." *Id.* at 3.

At the outset of the traffic stop, Officer Radford took a still photograph of the vehicle and license plate before he exited his patrol vehicle.  Meanwhile, Jarvis and Martin exited their vehicle, and Martin moved to a nearby embankment.  While approaching the vehicle, Radford promptly informed Jarvis and Martin that the stop was for Jarvis's vehicle obstructing the single-lane bridge over the Cherry River.  Almost immediately, Radford asked Jarvis for her driver's license and inquired whether there were any firearms inside her automobile.  Notably, as the panel majority acknowledges, Jarvis "admitted to a firearm being in the vehicle." *See ante* 3.  At that point, Jarvis reached through the open driver's side window of the vehicle to access her purse and locate her driver's license and insurance information.  Radford also asked Martin for his driver's license, which he produced.

Officer Radford then asked Jarvis where the then-disclosed firearm was located in her vehicle.  As the panel majority explains, "Jarvis gestured that the firearm was beneath the driver's seat," and Radford then "retrieved the firearm." *See ante* 3.  Of relevance here, Radford again asked whether there was anything else in the vehicle, and Jarvis finally admitted — after providing evasive and false answers — that there was, in fact, another firearm underneath the passenger's seat, which she indicated belonged to Martin's mother.[4]

---

[4] Giving "evasive and false" answers means that Jarvis initially lied to Officer Radford about there not being another firearm inside the vehicle. *See, e.g.*, 18 U.S.C. § 1001(a)(2) (specifying that "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly (Continued)

From there, Officer Radford returned to his patrol vehicle to run a license and criminal history check. As the majority notes, because of "poor" cellular service in the remote and desolate part of the National Forest, Radford "had to radio police dispatch to run the checks[.]" *See ante* 4. During the interregnum between requesting and receiving those reports, Radford instructed Martin and Jarvis "to stay outside of [their] vehicle[.]" *Id.* Approximately 12-and-a-half minutes later, police dispatch reported to Radford that Martin has prior felony convictions that prohibit him from possessing a firearm. Radford thereupon placed Martin under arrest, secured the second firearm from under the passenger seat of the vehicle, and released Jarvis without issuing a traffic citation for obstructing the bridge. Radford then took Martin to a nearby family gathering, spoke to Martin's mother about the firearm, released Martin, and informed him that criminal charges were possible.

## B.

In 2023, a grand jury in the Southern District of West Virginia returned an indictment against Martin, charging him with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) (the "firearm offense"). During the pre-trial proceedings, Martin moved in August of 2024 to suppress all evidence obtained during the September 2021 traffic stop, along with all inculpatory statements he made during that encounter. Martin predicated his suppression request on the fact that Officer Radford did not diligently pursue the purpose of the traffic stop (i.e., the vehicle

---

and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation shall be fined under this title [or] imprisoned not more than 5 years").

obstructing the single-lane bridge), but that Radford had unlawfully extended the stop in order to engage in a firearms investigation. In October 2024, the district court conducted a hearing in Charleston on Martin's motion to suppress. During that hearing, the prosecutors called Radford to testify about the events of Martin's arrest in the National Forest.

By its Memorandum Opinion and Order of October 2024, the district court denied Martin's motion to suppress. *See United States v. Martin*, No. 2:24-cr-00025 (S.D. W. Va. Oct. 4, 2024), ECF No. 71 (the "Memorandum Opinion"). Therein, the court found Officer Radford to be a credible witness, and accordingly "credit[ed] his account of his interactions" with Martin and Jarvis. *Id.* at 3 n.1.[5] With that being so, the court ruled that Radford's firearms-related questioning — at the outset of and during the traffic stop — was constitutionally permissible under the Fourth Amendment because Radford had legitimate concerns regarding his safety in the remote and desolate portion of the National Forest. To that end, the court sensibly acknowledged that, "[a]lthough carrying firearms, including concealed firearms, is generally legal in West Virginia," an officer — like Radford — "conducting a traffic stop is entitled to inquire about firearms or other hazards for officer safety," especially when he is "patrolling . . . remote areas." *Id.* at 7 n.2. Relying on our Court's precedent, the Memorandum Opinion thus concluded that Radford's firearms-related questioning was permissible and did not otherwise extend the contested traffic stop.

---

[5] The Memorandum Opinion credited Officer Radford's testimony on grounds that he provided "clear and direct answers to questions both on direct and cross" during the suppression hearing, and that "[h]e did not appear defensive or evasive, and his responses were consistent with the other available evidence." *See* Memorandum Opinion 3, n.1.

18

In November 2024, Martin pleaded guilty — by way of a written Rule 11 conditional guilty plea agreement — to the firearm offense. In April 2025, Martin was sentenced to 12 months in prison, followed by a three-year term of supervised release. Martin timely noted this appeal later in April of 2025, and we possess jurisdiction under 28 U.S.C. § 1291.

## II.

Against this backdrop, my friends in the panel majority have concluded that the district court erred in denying Martin's motion to suppress evidence obtained during the September 2021 traffic stop. Specifically, the majority reasons that a Fourth Amendment violation occurred here because Officer Radford "immediately engag[ed] in a criminal investigation unrelated to the traffic violation warranting the stop[.]" *See ante* 8. According to the majority, Radford's firearms-related questioning was "not reasonably related in scope to the purpose of the stop and [was] instead focused on investigating unrelated criminal activity." *Id.* As my colleagues see things, "[t]hose inquiries would have been lawful if they were conducted during the course of a diligently conducted stop, but that is not the case here because Radford abandoned the stop from the very beginning." *Id.* at 8-9. As to Radford's concerns regarding officer safety, the majority reasons that, based on the "totality of the circumstances," there were not sufficient "safety concerns" to justify Radford's questioning about the presence of firearms inside the vehicle. *Id.* at 10.

Parting ways with my dear friends, I would affirm the Memorandum Opinion's well-reasoned denial of Martin's motion to suppress. Put simply, as confirmed by our Court's recent 2021 decision in *United States v. Buzzard*, 1 F.4th 198 (4th Cir. 2021), it was

19

constitutionally permissible in these circumstances — under the Fourth Amendment and applicable precedent — for Officer Radford to promptly inquire about the presence of firearms inside of the vehicle occupied by Martin and Jarvis, near the beginning of and during the September 2021 traffic stop in the National Forest.  And that is so because — (1) by employing the well-established "objective reasonableness" Fourth Amendment standard, *see Ohio v. Robinette*, 519 U.S. 33, 39 (1996); (2) by stripping away any subjective "state of mind" of the officer, *see Whren v. United States*, 517 U.S. 806, 813 (1996); and (3) by viewing the evidence in the light most favorable to the government, *see United States v. Jamison*, 509 F.3d 623, 628 (4th Cir. 2007) — Radford's questioning about the presence of firearms inside the vehicle readily passes constitutional muster.

## A.

As background, the Fourth Amendment protects the rights of citizens "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *See* U.S. Const. amend. IV.  At issue in these proceedings, the stop of an automobile and the detention of its occupants constitutes a seizure within the meaning of the Fourth Amendment.  *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  To that end, the Supreme Court has recognized that, because a traffic stop is "a limited seizure more like an investigative detention than a custodial arrest," a federal court is obliged to employ the two-step analysis of *Terry v. Ohio*, 392 U.S. 1 (1968), in determining whether a traffic stop comports with the Fourth Amendment.  *See United States v. Rusher*, 966 F.2d 868 (4th Cir. 1992) ("We therefore employ the Supreme Court's analysis for investigative detention used in *Terry v. Ohio* . . . to determine the limits of police conduct in routine traffic stops.").

20

In this light, *Terry* presents a federal court with a dual inquiry: (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *See Terry*, 392 U.S. at 20; *see also Florida v. Royer*, 460 U.S. 491, 500 (1983) (recognizing that "[t]he scope of the detention must be carefully tailored to its underlying justification"). In that regard, "[i]f the initial traffic stop was illegal or the officers exceeded the stop's proper scope, the seized contraband is excluded under the 'fruit of the poisonous tree doctrine.'" *See Rusher*, 966 F.2d at 875 (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *United States v. Durant*, 730 F.2d 1180, 1182 (8th Cir.), *cert. denied*, 469 U.S. 843 (1984)).

It is imperative, however, that a traffic stop must remain limited in scope: "A seizure for a traffic violation justifies a police investigation of that violation." *See United States v. Cole,* 21 F.4th 421, 427-28 (7th Cir. 2021) (quoting *Rodriguez*, 575 U.S. at 354). Indeed, officers cannot and should not detour from the "mission" of the stop to investigate other criminal activity. *See Rodriguez,* 575 U.S. at 356-57. In fact, detours that prolong a traffic stop and are unrelated to the mission of the stop itself have been held by courts across our Country as violating the Fourth Amendment, unless the officer has reasonable suspicion of other criminal activity to independently justify prolonging the stop. *Id.* at 355.

Of great importance here, the Supreme Court has heretofore recognized that "traffic stops are 'especially fraught with danger to police officers.'" *See Rodriguez*, 575 U.S. at 356 (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)). As a result, a law enforcement officer "may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Id.*; *accord Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (observing

21

that "roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect" (citation modified)); *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (recognizing the "inordinate risk confronting an officer as he approaches a person seated in an automobile").

To that end, in *United States v. Buzzard*, 1 F.4th 198 (4th Cir. 2021), our Court — in a unanimous decision authored by our esteemed colleague Judge Diaz — recognized that during the course of a valid traffic stop, law enforcement can ask questions "related to officer safety" — i.e., "[a]re there weapons in the vehicle?" — so long as such questioning is supported by the "totality of the circumstances." *Id.* at 203-04. And Judge Diaz reasoned that such questioning by law enforcement is always constitutionally permissible due to "the importance of officer safety and the Supreme Court's repeated recognition that traffic stops are especially fraught with danger to police officers," so long as the questioning does not otherwise prolong a stop "beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Id.* at 204 (quoting *Rodriguez*, 575 U.S. at 350-51).

Nor is our Court alone in that respect. To be sure, our sister circuits have consistently recognized the authority of "officers conducting a traffic stop [to] inquire about dangerous weapons." *See United States v. Everett*, 601 F.3d 484, 495 (6th Cir. 2010) (explaining that "it would be irrational to conclude that officers cannot take the less intrusive measure of simply asking whether a driver has a gun" (citation modified)); *see also, e.g.*, *United States v. Ross*, 151 F.4th 487, 497 (3d Cir. 2025) (recognizing that "[q]uestions directly tied to officer safety, such as asking the driver whether there are any passengers in the car or if he has any weapons on him, are always permitted on officer-safety grounds"); *United States*

22

*v. Taylor*, 60 F.4th 1233, 1237 (9th Cir. 2023) (concluding that questions about there being "any weapons in the vehicle . . . are negligibly burdensome precautions that an officer may take in order to complete his mission safely" (citation modified)); *United States v. Yang*, 39 F.4th 893, 902-03 (7th Cir. 2022) (recognizing that officer questioning about whether there were any weapons in stopped truck was "proper because it concerned officer safety"); *United States v. Weaver*, 9 F.4th 129, 143 n.57 (2d Cir. 2021) (observing that questioning aimed at gauging risks or deescalating situation may qualify as "reasonable precautionary measures during traffic stops to ensure the safety of [officers] and others"); *United States v. May*, 203 F.3d 53, at *3 (D.C. Cir. 1999) (unpublished) (concluding that "[t]he Fourth Amendment . . . permits an officer to ask simply whether a driver has a gun").

Lastly, as our Court has observed, the lawfulness of an officer's actions with regard to the Fourth Amendment "turns not on the officer's actual state of mind at the time the challenged action was taken, but rather on an objective assessment of the officer's actions." *See United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008). That is, "[i]n assessing the legitimacy of a traffic stop, we do not attempt to discern an officer's subjective intent for stopping the vehicle." *See United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016). Rather, we are obliged to simply ask whether "the circumstances, viewed objectively, justify th[e] action" of the police officer. *See Whren v. United States*, 517 U.S. 806, 813 (1996) (citation modified); *United States v. Johnson*, 734 F.3d 270, 275 (4th Cir. 2013).

## B.

Against this backdrop of controlling legal principles, the issue that emerges is whether Officer Radford's firearms-related questioning of Jarvis and Martin in the

23

Monongahela National Forest was permissible under the Fourth Amendment?  My friends in the majority say that such questioning was impermissible.  Put simply, I readily disagree.

In my view, the result here is rather straightforward:  that is, based even on the "totality of the circumstances," *see Buzzard*, 1 F.4th at 203-04, Officer Radford's firearms-related line of questioning — interposed near the beginning of and during the otherwise-valid traffic stop of September 2021 — was predicated on sensible fears regarding his own personal safety in a remote and desolate part of the Monongahela National Forest.  Such objectively reasonable questioning by law enforcement is expressly permitted under the Fourth Amendment, as both the Supreme Court and our Court have recognized.  *See, e.g.*, *Rodriguez*, 575 U.S. at 350-51; *Johnson*, 555 U.S. at 327; *Buzzard*, 1 F.4th at 204.

Consistent with those precedents, I am of opinion that, viewing the evidence of record in the light most favorable to the government, the district court correctly concluded in its Memorandum Opinion that Officer Radford's "questions related to officer safety and thus related to the traffic stop's mission." *See Buzzard*, 1 F.4th at 203.  To be sure, as in the *Buzzard* proceedings, Radford — who was alone in patrolling a remote and lonely portion of the National Forest — was "outnumbered" by two armed occupants of the other vehicle, Jarvis and Martin.  *Id.*  And similar to *Buzzard*, Radford promptly asked firearms-related questions of Martin and Jarvis because of his legitimate concerns for officer safety, which fears the able district judge credited.  Accordingly, "given the importance of officer safety and the Supreme Court's repeated recognition that traffic stops are especially fraught

24

with danger to police officers," *id.* at 204 (citation modified), Radford's firearms-related questioning during the September 2021 traffic stop was constitutionally permissible.[6]

Moving on, my friends in the panel majority are also incorrect in their assessment that Officer Radford's questioning unlawfully "prolonged" the traffic stop. That is so, according to the majority, because Radford's "questions [about the presence of firearms] were not reasonably related in scope to the purpose of the stop and were instead focused on investigating unrelated criminal activity." *See ante* 8-9. But the majority's rationale is unjustified, given that *Buzzard* explicitly recognized that, pursuant to Supreme Court precedent, such questions do not "extend [a traffic] stop even by a second" if they are asked "*during* a lawful traffic stop." *See* 1 F.4th at 204 (citing *Rodriguez*, 575 U.S. at 350, and *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)); *United States v. Bowman*, 884 F.3d 200, 210 (4th Cir. 2018) ("[P]olice during the course of a traffic stop may question a vehicle's occupants on topics unrelated to the traffic infraction . . . as long as the police do not extend an otherwise-completed traffic stop in order to conduct these unrelated investigations.").

---

[6] Attempting to distinguish *Buzzard*, the panel majority is quick to proclaim that the "totality . . . [of] these circumstances do not raise the same safety concerns as the circumstances in *Buzzard* did." *See ante* 10 (citation modified). The majority then goes on to explain why that is so. *Id.* at 10-11. But in their flawed analysis, my friends overlook the very important and salient facts that rendered Officer Radford's firearms-related questioning entirely reasonable, even pursuant to *Buzzard*'s totality-of-the-circumstances standard: Radford was alone in an extremely remote part of the National Forest, he was outnumbered by Martin and Jarvis, and he had limited access to the outside world. Not only that, but Radford credibly testified that he was always concerned with officer safety. Instead of grappling with those facts, the majority cherry-picks other facts and erroneously says that — with the benefit of hindsight — Radford's questioning was unreasonable.

25

And that is precisely what occurred here. Viewing the evidence in the light most favorable to the government, Radford's questioning of Martin and Jarvis regarding the presence of firearms inside their vehicle occurred during a valid and ongoing traffic stop. Just like in *Buzzard*, when Radford initially asked questions about the presence of firearms inside the vehicle, he did not yet "have the information he needed to perform the customary checks on the driver and the vehicle." *See* 1 F.4th at 204. Simply put, the traffic stop was not prolonged" by Radford's questioning — as the majority asserts — because those questions were "asked during a lawful traffic stop and didn't prolong the stop." *Id.*

Lastly, it is worth observing that the *Buzzard* defendants — who, like Martin, were ably represented by the Federal Public Defender for the Southern District of West Virginia — maintained that "by asking whether there was anything illegal in the vehicle," the police officer in that situation had "transformed a legitimate traffic stop into an investigation to see if [the defendants] were engaged in any criminal conduct." *See* 1 F.4th at 203. And the *Buzzard* defendants asserted that, because "the question was directed toward general law enforcement goals, not the basis for the traffic stop or concerns for officer safety . . . [t]he investigation unduly extended the traffic stop without . . . having reasonable suspicion to do so." *Id.* (citation modified). Tellingly, those are the very arguments that Martin now advances. And despite our Court's rejection of those flawed contentions in *Buzzard*, the panel majority has surprisingly adopted them, "hook, line, and sinker."[7]

---

[7] Of course, to the extent there is a conflict between the majority's decision here and our Court's 2021 *Buzzard* precedent, then *Buzzard* must control, as the prior panel decision. *See, e.g.*, *McMellon v. United States*, 387 F.3d 329, 334 (4th Cir. 2003) (en banc).

III.

Pursuant to the foregoing, Officer Radford was constitutionally permitted under the Fourth Amendment to inquire — during the subject September 2021 traffic stop in a remote and desolate part of the Monongahela National Forest — whether Martin and Jarvis had firearms inside their vehicle. His questioning was based on credited and objectively reasonable fears concerning officer safety. Because I would affirm the Memorandum Opinion's well-reasoned denial of Martin's motion to suppress, I respectfully dissent.